RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0322P (6th Cir.)
File Name: 03a0322p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,
ex rel.,

*Plaintiff-Appellee,*

SEAN BLEDSOE,

*Plaintiff/
Relator-Appellant,*

*v.*

COMMUNITY HEALTH
SYSTEMS, INC.; SPARTA
HOSPITAL CORPORATION
d/b/a White County
Community Hospital,

*Defendants-Appellees.*

No. 01-6375

Appeal from the United States District Court
for the Middle District of Tennessee at Cookeville.
No. 00-00083—William J. Haynes, Jr., District Judge.

Argued: March 12, 2003

Decided and Filed: September 10, 2003

2  *United States of America, et al. v.*  No. 01-6375
*Community Health Systems, et al.*

Before: MOORE and CLAY, Circuit Judges; LAWSON,
District Judge.[*]

———————————

## COUNSEL

**ARGUED:** Mike Bothwell, MIKE BOTHWELL, P.C.,
Roswell, Georgia, for Appellant. Steve Frank, UNITED
STATES DEPARTMENT OF JUSTICE, CIVIL DIVISION,
APPELLATE SECTION, Washington, D.C., Michael L.
Waldman, FRIED, FRANK, HARRIS, SHRIVER &
JACOBSON, Washington, D.C., for Appellees. **ON BRIEF:**
Mike Bothwell, G. Mark Simpson, MIKE BOTHWELL,
P.C., Roswell, Georgia, for Appellant. Steve Frank, Douglas
N. Letter, UNITED STATES DEPARTMENT OF JUSTICE,
CIVIL DIVISION, APPELLATE SECTION, Washington,
D.C., Michael L. Waldman, FRIED, FRANK, HARRIS,
SHRIVER & JACOBSON, Washington, D.C., John R.
Jacobson, BOWEN, RILEY, WARNOCK & JACOBSON,
Nashville, Tennessee, for Appellees.

———————————

## OPINION

———————————

CLAY, Circuit Judge. Plaintiff/Relator Sean Bledsoe
("Relator") appeals from an order entered by the district court
on September 19, 2001. Relator had brought a *qui tam* action
against Defendants Community Health Systems, Inc. ("CHS")
and Sparta Hospital Corporation d/b/a White County
Community Hospital ("White County Hospital"), alleging
violations of the False Claims Act ("FCA"), 31 U.S.C. § 3729

———————————

[*] The Honorable David M. Lawson, United States District Judge for
the Eastern District of Michigan, sitting by designation.

*et seq.* The district court entered an order in which it denied Relator's motion to recognize a settlement agreement reached between the United States government and CHS, granted Defendants' motion for judgment on the pleadings, and dismissed Relator's claims with prejudice.

In this case involving some issues of first impression, we **REVERSE** the judgment of the district court for the reasons discussed below.

## BACKGROUND

### *Procedural History*

On February 17, 1998, Relator filed a *qui tam* action against CHS, as well as other entities and officers of the various entities, in the United States District Court for the Northern District of Georgia.[1] The complaint alleged that CHS and others violated the FCA, 31 U.S.C. § 3729 *et seq.,* by "unbundling services and billing Medicare and Medicaid" and "miscoding and upcoding items billed to Medicare and Medicaid." (J.A. at 25.) Pursuant to 31 U.S.C. § 3730(b)(2),[2]

---

[1] The other listed defendants in the original complaint were Forstmann Little & Co. (a privately-owned company that wholly owns CHS), Cookville Regional Medical Center (a nonprofit corporation), Theodore Forstmann (chief executive officer ("CEO") and chief financial officer ("CFO") of Forstmann Little & Co.), Thomas H. Lister (general partner of Forstmann Little & Co.), E. Thomas Chaney (former president and CEO of CHS), Ernest Bacon (president and CEO of CHS), Barry Stewart (CFO of CHS), and John Does and John Doe corporations 1-99.

[2] "A copy of the complaint and written disclosure of substantially all material evidence and information the person possesses shall be served on the Government pursuant to Rule 4(d)(4) [now Rule 4(i)] of the Federal Rules of Civil Procedure. The complaint shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders. The Government may elect to intervene and proceed with the action within 60 days after it receives both

the complaint was filed under seal and served upon the United States, but the government declined to intervene in the action. Relator thereafter served the complaint on the named defendants in May of 1999.

On July 3, 2000, Relator filed a First Amended Complaint ("amended complaint"). The amended complaint deleted some defendants, added a defendant, and contained new substantive allegations. CHS and White County Hospital (collectively "Defendants") filed separate answers to the amended complaint.

Relator's case subsequently was transferred to the Middle District of Tennessee. Defendants then filed a motion, pursuant to Federal Rule of Civil Procedure 12(c), for judgment on the pleadings on November 3, 2000. Relator filed a brief in opposition to Defendants' motion. Additionally, Relator filed a motion to recognize a separate settlement agreement entered into between the government and CHS, claiming that he was entitled to a relator's share of the settlement proceeds.

On September 18, 2001, the district court filed a memorandum opinion, which (1) granted Defendants' Rule 12(c) motion, (2) denied Relator's motion to recognize the settlement, and (3) dismissed Relator's lawsuit with prejudice. An order to this effect was entered on the same day. Relator's timely appeal followed.

---

the complaint and the material evidence and information." 31 U.S.C. § 3730(b)(2).

### *Substantive Facts*

#### A. Relator's and CHS' Cooperation with the Government

In 1995, Relator began working at White County Hospital, which is one of several hospitals owned by CHS. At some point during his tenure at White County Hospital, Relator became aware of "a serious problem with upcoding and other billing irregularities"[3] (J.A. at 167), and he reported these irregularities to the government between 1996 and 1998.

Sometime in the fall of 1997, CHS was approached by the government about possible upcoding at two different CHS hospitals. On December 18, 1997, CHS contacted the Office of Inspector General of the United States Department of Health and Human Services ("OIG-HHS"), and disclosed that it had detected medical coding irregularities at its hospitals during recent internal audit efforts. CHS informed OIG-HHS of its plans to undertake an audit of its hospitals' coding, disclose the results, and repay any overpayments it had received from Medicare. After lengthy negotiations, CHS conducted the self-audit, and it presented preliminary findings to OIG-HHS on December 18, 1998. OIG-HHS simultaneously worked with the Department of Justice ("DOJ") to investigate whether a FCA violation might have occurred. This investigation, of which Relator apparently was unaware at the time, concluded in mid-1999.

#### B. Relator's Original Complaint and Written Disclosure

In the meantime, Relator filed his *qui tam* action in February of 1998. The original complaint alleged that the Cookville Regional Medical Center ("Cookville"), one of the original named defendants, "perpetrated a scheme of defrauding the United States Government by unbundling services and billing Medicare and Medicaid," and that CHS and other defendants "engaged in a scheme of defrauding the United States Government by miscoding and upcoding items billed to Medicare and Medicaid." (J.A. at 25.) Count One of the complaint alleged that the defendants "knowingly presented, caused to be presented, or conspired to present" false claims in violation of 31 U.S.C. § 3729(a)(1). (J.A. at 25.) Count Two alleged that the defendants "agreed to undermine [the Medicare and Medicaid] laws, rules, and regulations" and that they "conspired . . . to defraud the government by acting collectively to submit or cause to be submitted false and fraudulent claims for payment to the United States in violation of 31 U.S.C. § 3729(a)(3)." (J.A. at 26.)

With the sealed complaint, Relator also furnished to the government, as required, a "written disclosure of substantially all material evidence and information [he] possesse[d]." 31 U.S.C. § 3730(b)(2). In the written disclosure, Relator indicated, in pertinent part, that he had witnessed first-hand, or learned from others about, (1) unbundling[4] of services while working at Cookville; (2) upcoding of contract services and disposable equipment, as well as fraudulent inflation of cost reports, in White County Hospital's nursing and

---

[3]"Upcoding," a common form of Medicare fraud, is the practice of billing Medicare for medical services or equipment designated under a code that is more expensive than what a patient actually needed or was provided. *See* Bonnie Schreiber et al., *Health Care Fraud,* 39 AM. CRIM. L. REV. 707, 750 n.331 (2002).

[4]"Unbundling" occurs when a health provider, who initially issues a service as one package, breaks down the service into component parts and finds individual reimbursement codes for those components, so long as the individual rates combined exceed the global rate. *See* Schreiber et al., *supra* note 4, at 750 n.331.

respiratory departments; (3) misuse of a doctor's medical provider number in the emergency room; (4) double billing and billing for unbillable items; (5) improper changing of patients' statuses from an outpatient/observation status to an inpatient status; (6) billing for fictitious continuous heart monitoring; and (7) improperly premature discharging of hospital patients when Medicare reimbursement eligibility had been exhausted. In support of his allegations, Relator also provided a list of hospital employees and asserted his possession of supporting documents.

## C.   The Government and CHS' Settlement Agreement

The government[5] and CHS ultimately agreed on a settlement in which CHS would repay to the government Medicare overpayments in the amount of $30,904,625.56. The original version of the settlement agreement also "specifically reserved and excluded from the scope and terms of this Agreement as to any entity or person (including the Released Parties)" claims asserted in a *qui tam* action brought by another relator in the Middle District of Tennessee. (J.A. at 354-55.) Relator's *qui tam* suit was not referenced in the original version of the settlement agreement. On or about March 28, 2000, a revised version of the settlement agreement was circulated, including a substituted page 12, which included Relator's claim among the claims specifically excluded from the settlement agreement. All the parties then signed the revised settlement agreement. The settlement agreement's effective date was May 8, 2000.

---

[5] Specifically, the government was acting through the DOJ and on behalf of OIG-HHS. Other parties joining the United States in the settlement agreement were TRICARE Management Activity, various states, and relator Health Outcome Technologies.

## D.   Dr. Adams' Intervening Lawsuit and Relator's Amended Complaint

On January 15, 1999 (after the government declined to intervene in Relator's *qui tam* action but before Relator's complaint was served on Defendants), Dr. Robert Adams, former medical director of White County Hospital's geropsychiatric treatment program, filed a complaint in Tennessee state court, alleging wrongful termination. Specifically, he contended that he was terminated for refusing to participate in White County Hospital's policies regarding Medicare billings, which included "provid[ing] unneeded medical services, falsify[ing] patient charts, and [performing] other illegal and unethical activities," with the goal of producing longer patient stays and, thus, higher hospital reimbursement amounts.

After the filing of Dr. Adams' Tennessee state court lawsuit, Relator filed an amended complaint on July 3, 2000. The amended complaint, among other things, contained new substantive allegations, including fraud in White County Hospital's psychiatric unit. Specifically, the amended complaint asserted that Defendants had engaged in a scheme to defraud the government by admitting to the psychiatric unit patients who were not Medicare or Medicaid eligible. Additionally, the amended complaint alleged that Defendants "encourag[ed] physicians to maximize the average length of stay [in the psychiatric unit], whether medically necessary or not, . . . [and] terminated Dr. Robert Adams as director of the psychiatric unit because he declined to increase the average length of stay of patients unnecessarily." (J.A. at 48, 49.) The amended complaint also alleged a variety of other fraudulent Medicare billing practices, including fraudulent uses of provider numbers, fraudulent billing for continuous monitoring services, improper payment of bonuses to providers based on hospital admissions, misrepresentation of the employment status of certain physicians recruited for an

underserved area in order to obtain federal funds, and unbundling of various services.

**E.    The District Court's Rulings**

On September 18, 2001, the district court granted Defendants' motion for judgment on the pleadings, pursuant to Federal Rule of Civil Procedure 12(c). In doing so, it reasoned that Relator's amended complaint was required to state its FCA claims with particularity, pursuant to Federal Rule of Civil Procedure 9(b), and that the amended complaint had failed in this regard. The court then decided to dismiss Relator's claims with prejudice, reasoning that Relator had enjoyed a sufficient time period in which he could have amended his amended complaint to comply with Rule 9(b) but had failed to do so.

The district court also denied Relator's motion to recognize the May 8, 2000 settlement between the government and CHS, reasoning that Relator was not entitled, under any provision of the FCA, to a relator's share of the settlement proceeds. Pursuant to these two rulings, the district court dismissed the case.

**ANALYSIS**

The FCA, 31 U.S.C. § 3729 *et seq.,* is an anti-fraud statute that prohibits the knowing submission of false or fraudulent claims to the federal government. Specifically, § 3729 imposes liability when (1) a person presents, or causes to be presented, a claim for payment or approval; (2) the claim is false or fraudulent; and (3) the person's acts are undertaken "knowingly," i.e., with actual knowledge of the information, or with deliberate ignorance or reckless disregard for the truth or falsity of the claim. *Id.* § 3729(a)(1), (b). Section 3729(a)(3) prohibits conspiracies "to defraud the Government by getting a false or fraudulent claim allowed or paid." *Id.* § 3729(a)(3). Persons who violate the FCA are liable for civil

penalties and double or treble damages, plus the costs incurred in bringing a FCA lawsuit. *Id.* § 3729(a).

Additionally, the FCA allows a private individual to bring a lawsuit alleging FCA violations on behalf of the government, which is known as a *qui tam* action. *Id.* § 3730. The private individual bringing the *qui tam* suit, known as a relator, must first serve the complaint upon the government, where the complaint then remains under seal for at least sixty days. *Id.* § 3730(b)(2). During this time period, the government may elect to intervene. *Id.* If the government does not intervene in the action, the relator may proceed with the action. *Id.* § 3730(b)(4)(B), (c)(3). If the relator successfully recovers funds for the government in pursuing the *qui tam* action, he or she is entitled to 25-30% of the proceeds recovered. *Id.* § 3730(d)(2). However, there are restrictions upon a relator's ability to proceed with a *qui tam* suit. For instance,

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing . . . unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

*Id.* § 3730(e)(4)(A). In other words, a relator may continue the *qui tam* suit based on publicly-disclosed information only if the relator is the original source of that information.

If the government intervenes in the action, it takes over the relator's case and adopts any or all of the allegations contained in the *qui tam* suit. *Id.* § 3730(c)(1). The relator, in turn, is entitled to 15-25% of any proceeds of the action or settlement. *Id.* § 3730(d)(1). Additionally, "the Government may elect to pursue its claim through any alternate remedy available to the Government, including any administrative proceeding to determine a civil money penalty." *Id.*

§ 3730(c)(5). If the government elects to pursue an "alternate remedy," the relator "shall have the same rights in such proceeding as such person would have had if the action had continued under this section." *Id.*

On appeal, we must resolve three issues: (1) whether the district court correctly dismissed Relator's amended complaint with prejudice for failure to comply with Federal Rule of Civil Procedure 9(b); (2) whether certain portions of Relator's amended complaint fall outside our subject matter jurisdiction because they are based upon publicly-disclosed information of which Relator was not the original source; and (3) whether the district court correctly determined that Relator was not entitled to a relator's share of the May 8, 2000 settlement agreement executed between the government and CHS.

## I.

We first consider whether the district court erred in granting Defendants' motion for judgment on the pleadings and dismissing with prejudice Relator's amended complaint for failing to comply with Federal Rule of Civil Procedure 9(b). We will address this issue as a three-part inquiry: (1) whether a complaint alleging FCA violations must comply with Rule 9(b); (2) if so, whether Relator's amended complaint satisfied the Rule 9(b) requirement; and (3) if the amended complaint did not satisfy the requirement, whether the district court properly dismissed it with prejudice.

### A.  A Complaint Alleging Violations of the FCA Must Comply with Federal Rule of Civil Procedure 9(b).

Relator argues on appeal that the district court erred in granting Defendant's Rule 12(c) motion because a complaint stating a violation of the FCA need not comply with Rule 9(b), which mandates that in "all averments of fraud . . . the circumstances constituting fraud . . . shall be stated with

particularity." Fed. R. Civ. P. 9(b). We review de novo the district court's statutory interpretation of the FCA as requiring Rule 9(b) compliance. *United States v. Rapanos,* __ F.3d __, 2003 WL 21789241, at *2 (6th Cir. Aug. 5, 2003) (citing *United States v. Markwood,* 48 F.3d 969, 975 (6th Cir. 1995)).

We recently held in a published case that a complaint alleging FCA violations must allege the underlying facts with particularity as required by Rule 9(b). *See Yuhasz v. Brush Wellman, Inc.,* __ F.3d __, 2003 WL 21976038, at *2 (6th Cir. Aug. 20, 2003). Therefore, the district court correctly required Relator's complaint to comply with Rule 9(b).

Although the FCA's statutory language does not expressly require Rule 9(b) compliance, it strongly suggests the propriety of requiring such compliance. Section 3729(a)(1) imposes liability when a person "knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a *false or fraudulent* claim for payment or approval." 31 U.S.C. § 3729(a)(1) (emphasis added). Moreover, Section 3729(a)(3) prohibits a person from "conspir[ing] to *defraud* the Government by getting a false or fraudulent claim allowed or paid." 31 U.S.C. § 3729 (emphasis added). Legislative history further reveals that Congress views the FCA "[a]s a civil remedy designed to make the Government whole for fraud losses." S. Rep. 99-345, at 6 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5271; *see also United States v. Borstein,* 423 U.S. 303, 309 (1976) (noting that the purpose of the FCA, when originally enacted, was to stop "the massive frauds perpetrated by large contractors during the Civil War"). In short, "[i]t is self-evident that the FCA is an anti-fraud statute." *Gold v. Morrison-Knudsen Co.,* 68 F.3d 1475, 1476 (2d Cir. 1995). Thus, when pleading violations of the FCA, a fraud statute, one necessarily makes averments of fraud and necessarily

must state with particularity the circumstances constituting the fraud. Fed. R. Civ. P. 9(b).

Relator disputes our characterization of the FCA as a "fraud" statute. He points out that Rule 9(b) only applies to "averments of fraud" and only requires that the "circumstances constituting fraud" need be stated with particularity, Fed. R. Civ. P. 9(b), whereas the FCA imposes liability on a person who "knowingly presents, or causes to be presented . . . a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1). Therefore, Relator observes, a complaint alleging a FCA violation need only show that the person "knowingly," or with "reckless disregard" or "deliberate ignorance," presented a false claim, and the FCA suit is not required to prove many of the other traditional elements of fraud, such as scienter (intent to defraud), "actual damages" to the government, or "reasonable reliance" by the government. Relator argues that such a lowered level of intent demonstrates that the FCA is not a fraud statute and, consequently, a complaint need not state its FCA allegations with particularity.

We are not persuaded by the distinctions Relator has drawn. The fact that the FCA does not require proof of all the traditional elements of a fraud claim, such as scienter, does not mean that the FCA is not an anti-fraud statute. Congress may have had special reasons for liberalizing the level of intent needed to prove a FCA violation,[6] but its unambiguous

legislative intent was to combat fraud and, consequently, to hold civilly liable those persons who submit fraudulent claims. Moreover, as other courts have pointed out, the FCA's more lenient intent requirement "does not conflict with Rule 9(b), since '[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally.'" *Gold,* 68 F.3d at 1477 (quoting Fed. R. Civ. P. 9(b)). Relator is not required to state with particularity Defendant's intent to defraud; he is only required to state with particularity the circumstances (i.e., the time, place, and substance) surrounding the fraudulent activity. *See id.* Application of Rule 9(b) is appropriate in that it would deter those alleging FCA violations from making "overly broad allegations." *United States ex rel. LaCorte v. SmithKline Beecham Clinical Labs., Inc.* 149 F.3d 227, 234 (3d Cir. 1998).[7]

Therefore, stating a violation of the FCA constitutes an "averment[] of fraud" for purposes of Rule 9(b), and a complaint alleging such a claim must state the circumstances surrounding the FCA violation with particularity. *Yuhasz,* 2003 WL 21976038, at *2.

---

[6]Indeed, Congress clarified the "knowing" standard in 1986 to emphasize that the government need not prove that the defendant had actual knowledge or a specific intent to submit a false claim, reasoning that this high standard was "inappropriate in a civil remedy" and "prohibit[ed] the filing of many civil actions to recover taxpayer funds lost to fraud." S. Rep. 99-345, at 7, *reprinted at* 1986 U.S.C.C.A.N. 5266, 5272. The Committee Report further noted that the "actual knowledge" standard precluded the government from "hold[ing] responsible those corporate officers who insulate themselves from knowledge of false

claims submitted by lower-level subordinates. This 'ostrich-like' conduct which can occur in large corporations poses insurmountable difficulties for civil false claims recoveries." *Id.* at 6-7, 1996 U.S.C.C.A.N. at 5272.

[7]Moreover, all the other circuits to have considered the issue have held that FCA claims must comply with Rule 9(b). *See Bly-Magee v. California,* 236 F.3d 1014, 1018 (9th Cir. 2001); *Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 783-84 (4th Cir. 1999); *LaCorte,* 149 F.3d at 234; *United States ex rel. Thompson v. Columbia/HCA Heathcare Corp.,* 125 F.3d 899, 903 (5th Cir. 1997); *Gold,* 68 F.3d at 1476; *United States ex rel. Cooper v. Blue Cross & Blue Shield of Florida,* 19 F.3d 562, 568 (11th Cir. 1994).

## B. The Allegations of FCA Violations in Relator's Amended Complaint Are Not Stated with Sufficient Particularity.

Our review of whether the district court properly granted Defendants' motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) is guided by that of a motion to dismiss under Federal Rule of Civil Procedure 12(b). *Ziegler v. IBP Hog Market, Inc.,* 249 F.3d 509, 511-12 (6th Cir. 2001) (citing *Mixon v. Ohio,* 193 F.3d 389, 399-400 (6th Cir. 1999)). Thus, our review of the district court's ruling is de novo. *Grindstaff v. Green,* 133 F.3d 416, 421 (6th Cir. 1998). Our inquiry is whether, based on the allegations in the amended complaint, Relator can prove any set of facts that would entitle him to relief. *Mixon,* 193 F.3d at 400. In undertaking this inquiry, we will construe the amended complaint in the light most favorable to Relator and accept all of its factual allegations as true. *Ziegler,* 249 F.3d at 512.

In complying with Rule 9(b), a plaintiff, at a minimum, must "allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Coffey v. Foamex L.P.,* 2 F.3d 157, 161-62 (6th Cir. 1993) (internal quotation marks and citations omitted); *see also United States ex rel. Branhan v. Mercy Health Sys. of Southwest Ohio,* No. 98-3127, 1999 WL 618018, at *1 (6th Cir. Aug. 5, 1999) (affirming dismissal of a complaint alleging improper billing in violation of the FCA because it "failed to allege a single specific incident in which improper billing occurred and the plaintiff never set forth the dates, times, or the names of individuals who engaged in the alleged improper billing"). Essentially, the amended complaint should provide fair notice to Defendants and enable them to "prepare an informed pleading responsive to the specific allegations of fraud." *Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n,* 176 F.3d 315, 322 (6th Cir.

1999) (citing *Michaels Bldg. Co. v. Ameritrust Co., N.A.,* 848 F.2d 674, 679 (6th Cir. 1988)).

We agree with the district court that Relator's amended complaint failed to state FCA violations with sufficient particularity. Notably, the amended complaint failed to set forth dates as to the various FCA violations or any particulars as to the incidents of improper billing Relator supposedly witnessed first-hand. Additionally, the amended complaint did not specify the names of any individuals involved in the improper billing, save for Dr. Adams, who was allegedly terminated in retaliation for refusing to engage in the fraudulent billing practices. Indeed, the amended complaint often states that "Defendants" engaged in certain practices, without ever specifying the defendants to which it was referring. A complaint "may not rely upon blanket references to acts or omissions by all of the 'defendants,' for each defendant named in the complaint is entitled to be apprised of the circumstances surrounding the fraudulent conduct with which he individually stands charged." *Benoay v. Decker,* 517 F. Supp. 490, 493 (E.D. Mich. 1981) (internal quotation marks and citations omitted), *aff'd,* 735 F.2d 1363 (6th Cir. 1984); *see also Yuhasz,* 2003 WL 21976038, at *3 (holding that the complaint at issue did not comply with Rule 9(b) inasmuch as it failed to "identify specific parties, contracts, or fraudulent acts"). Based on all these deficiencies, we agree with the district court that the allegations in Relator's amended complaint have failed to comply with Rule 9(b).

## C. The District Court Abused Its Discretion in Dismissing Relator's Amended Complaint with Prejudice.

Relator alternatively challenges the district court's decision to dismiss his amended complaint with prejudice instead of affording him an opportunity to comply with Rule 9(b) by amending his amended complaint. We review a district court's decision to dismiss a complaint with prejudice for an

abuse of discretion. *Shepherd v. Wellman,* 313 F.3d 963, 971 (6th Cir. 2002) (citing *Grover v. Eli Lilly & Co.,* 33 F.3d 716, 718 (6th Cir. 1994)). We agree with Relator that dismissing his amended complaint with prejudice was improper.

In *EEOC v. Ohio Edison Co.,* 7 F.3d 541, 546 (6th Cir. 1993), we held that "where a more carefully drafted complaint might state a claim, a plaintiff must be given at least one chance to amend the complaint before the district court dismisses the action with prejudice." (quoting *Bank v. Pitt,* 928 F.2d 1108, 1112 (11th Cir. 1991)); *see also Coffey,* 2 F.3d at 162 (observing that "'federal courts must be liberal in allowing parties to amend their complaints'") (quoting *Hayduk v. Lanna,* 775 F.2d 441, 445 (1st Cir. 1985)). "Denial may be appropriate, however, where there is 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc.'" *Morse v. McWhorter,* 290 F.3d 795, 800 (6th Cir. 2002) (quoting *Foman v. Davis,* 371 U.S. 178, 182 (1962)). The relevant issues in our inquiry are (1) whether Relator had sufficient notice that his amended complaint was deficient, and (2) if so, whether Relator had an adequate opportunity to cure the deficiencies.

In this case, the district court declined to grant Relator an opportunity to amend the complaint, reasoning that "[g]iven the Relator's alleged first hand knowledge of these events and the pendency of this action for more than two years, Relator has had ample opportunity to cure the cited factual deficiencies in his pleadings." (J.A. at 317.) However, we are not persuaded that Relator was on sufficient notice that his amended complaint was deficient. The district court's September 18, 2001 opinion we now review constituted its first communication to Relator that (1) he was required to satisfy Rule 9(b) and (2) he failed to satisfy it. Yet this very same ruling denied Relator the opportunity to correct the

defects of which he had just been informed, electing instead to dismiss the amended complaint with prejudice.

Defendants argue that Relator was sufficiently on notice of the amended complaint's defects. Specifically, they point out that shortly after the original complaint had been unsealed and served upon the named defendants, defense counsel had contacted Relator's counsel and informed him that Defendants planned to file a motion for dismissal and sanctions against Relator unless Relator voluntarily dismissed the complaint. Among defense counsel's cited reasons for dismissal was the complaint's failure to state its allegations with sufficient particularity. The parties subsequently signed a stipulation to give Relator time to amend his complaint. Relator thereafter filed an amended complaint that included additional allegations but did not sufficiently particularize its allegations for purposes of complying with Rule 9(b).

We disagree with Defendants that the communications between the parties' counsel about amending the complaint to provide for more specificity constituted sufficient notice in this case. At the time Relator had filed his original and amended complaints, the law was unsettled as to whether a complaint alleging FCA violations needed to comply with Rule 9(b), and Relator therefore was not definitively on notice that he had to state his allegations with the specificity required by Rule 9(b). Indeed, his first notice that the complaint was deficient came from the district court's September 18, 2001 opinion, which then proceeded to dismiss his case with prejudice. Moreover, we do not discern from the record any "undue delay, bad faith or dilatory motive on the part of" Relator, or any "undue prejudice to [Defendants] by virtue of allowance of the amendment." *Morse,* 290 F.3d at 800 (quoting *Foman v. Davis,* 371 U.S. at 182) (internal quotation marks omitted).

Finally, there is some indication from the record that Relator possessed additional information that could have

allowed his amended complaint to allege the FCA violations and other fraud allegations with sufficient particularity, specifically his disclosure to the United States government when he filed his *qui tam* suit. For instance, the district court's opinion noted that Relator failed to name any individuals who engaged in the FCA violations, but in the disclosure filed with the government at the commencement of his *qui tam* suit Relator did provide some names and asserted his possession of supporting documents and additional information.

Given that "federal courts must be liberal in allowing parties to amend their complaints," *Coffey,* 2 F.3d at 162 (citing *Hayduk,* 775 F.2d at 445), we will remand the case to the district court to allow Relator to comply with Rule 9(b) by amending his amended complaint.

## II.

Defendants contend that even if the district court did not properly dismiss Relator's amended complaint with prejudice for failure to comply with Rule 9(b), Relator is barred from proceeding with paragraphs 17-24 of the amended complaint, pursuant to the FCA's public disclosure doctrine. We agree with Defendants.

As discussed earlier, the FCA precludes a federal court from exercising jurisdiction over allegations in a *qui tam* suit that are based upon publicly-disclosed information, unless the relator is the original source of that information. 31 U.S.C. § 3730(e)(4)(A). Thus, we must determine the following: (1) whether there was a public disclosure, (2) whether paragraphs 17-24 of Relator's amended complaint were "based upon" that public disclosure, and (3) whether Relator was an original source of the information.

There is little doubt that Dr. Adams' complaint, filed in Tennessee state court, qualifies as a public disclosure. *See*

*United States ex rel. McKenzie v. Bellsouth Telecomms., Inc.,* 123 F.3d 935, 939 (6th Cir. 1997) ("'Public disclosure' also includes documents that have been filed with a court, such as . . . a plaintiff's complaint.").

Furthermore, Relator's amended complaint was "based upon" information publicly disclosed in Dr. Adams' complaint. It is true that paragraphs 17-24 of the amended complaint were not wholly copied from Dr. Adams' complaint. Indeed, only part of the "fraud in the psychiatric unit" section of Relator's amended complaint appears to have been "borrowed" from Dr. Adams' complaint. Most notably, paragraphs 21, 23, and 24 of the amended complaint, which discussed the deliberate lengthening of patient stays in the psychiatric unit, appear to parallel Dr. Adams' allegations. Relator does allege other fraudulent activity in the psychiatric unit not discussed in Dr. Adams' complaint, to wit, classifying hospital employees principally stationed in other units as psychiatric unit employees to charge additional hospital expenses (paragraph 19); scheming to admit patients not qualifying for Medicare or Medicaid and fraudulently billing services to Medicare or Medicaid, and scheming to prolong patient stays until such eligibility expired or was close to expiring (paragraph 20); and recycling patients through the psychiatric unit in violation of Medicare and Medicaid regulations (paragraph 22).

Nevertheless, we have held that "based upon" means "'supported by,' which includes any action based *even partly* upon public disclosures." *McKenzie,* 123 F.3d at 940 (emphasis added). We made it clear that under our interpretation of "based upon," a person who bases any part of a FCA claim on publicly disclosed information is effectively precluded from asserting that claim in a *qui tam* suit. *Id.* Thus, although Relator's amended complaint contains more detailed allegations about the fraudulent billing practices in White County Hospital's psychiatric unit, Dr. Adams' complaint already effectively alerted the public to the

fraud occurring therein. Consequently, paragraphs 17-24 of the amended complaint were "based upon" Dr. Adams' complaint because three of the paragraphs in the amended complaint directly parallel Dr. Adams' allegations.

Finally, it appears that Relator is not an "original source" of the information contained in paragraphs 17-24 of his amended complaint. "Original source" means that the relator possesses "direct and independent knowledge of the information on which the [publicly disclosed] allegations are based," 31 U.S.C. § 3730(e)(4)(B), and voluntarily provided that information to the government before filing the *qui tam* action and prior to any public disclosure. *Id.*; *McKenzie,* 123 F.3d at 943.

In the instant case, Relator's original complaint made no mention of fraud in White County Hospital's psychiatric unit, or of Dr. Robert Adams. Relator did not raise allegations of fraud in White County Hospital's psychiatric unit until after Dr. Adams filed his state court lawsuit. Furthermore, the record does not reflect any evidence indicating that Relator informed the government about allegations of fraud in the psychiatric unit prior to the public disclosure (i.e., the filing of Dr. Adams' complaint). The disclosure accompanying Relator's original complaint makes no mention of the psychiatric unit whatsoever, and Relator points to nothing else on the record to support his case. Therefore, we find that Relator was not the original source of the fraud in White County Hospital's psychiatric unit. Relator's allegations having failed all three parts of the inquiry, no subject matter jurisdiction lies for paragraphs 17-24 of Relator's amended complaint.[8]

_____

[8] Relator argues that subject matter jurisdiction exists for his entire amended complaint because he filed his original complaint in federal court before Dr. Adams filed his complaint in state court, and because the complaint satisfied jurisdiction at the time the action commenced,

**III.**

Finally, we consider the district court's denial of Relator's motion to recognize the May 8, 2000 settlement agreement executed between the government and CHS. Because the district court's decision to deny Relator's motion to recognize the settlement was based upon its construction of statutory law, our review is de novo. *See Heggen v. Lee,* 284 F.3d 675, 679 (6th Cir. 2002) ("We engage in a *de novo* review because [the pertinent issue to be reviewed] is a question of law.").

The district court denied Relator's motion, reasoning that Relator was not entitled to any of the proceeds of the settlement because the government had not intervened in Relator's *qui tam* action; it instead pursued separate settlement negotiations with CHS, in which Relator did not take part. Relator contends that 31 U.S.C. § 3730(c)(5) entitles him to a share because the settlement agreement between the government and CHS constituted an "alternate remedy" with respect to the claims in his case. We agree with Relator.

As discussed earlier, § 3730(c)(3) provides that if the government elects not to intervene in a relator's *qui tam* action, the relator "shall have the right to conduct the action." 31 U.S.C. § 3730(c)(3). Section 3730(c)(5) adds,

_____

subsequent events cannot "oust" jurisdiction. We disagree. The fact remains that Relator did not allege the various billing improprieties in White County Hospital's psychiatric unit until he filed the amended complaint, which occurred after Dr. Adams filed his complaint in state court. Barring Relator from pleading these items after the fact is consistent with Congress' desire "[t]o prevent 'parasitic' qui tam actions in which relators, rather than bringing to light independently discovered information of fraud, simply feed off of previous disclosures of government fraud." *McKenzie,* 123 F.3d at 943 (quoting *United States ex rel. Siller v. Becton Dickinson & Co.,* 21 F.3d 1339, 1347 (4th Cir. 1994)).

Notwithstanding subsection (b), the Government may elect to pursue its claim through any alternate remedy available to the Government, including any administrative proceeding to determine a civil money penalty. *If any such alternate remedy is pursued in another proceeding, the person initiating the action shall have the same rights in such proceeding as such person would have had if the action had continued under this section.*

31 U.S.C. § 3730(c)(5) (emphasis added). Relator argues that this means that he is entitled to a share of the settlement proceeds, even though the government did not intervene in his *qui tam* suit, because it pursued an "alternate remedy," i.e., settlement negotiations. The government contends that Congress intended the "alternate remedy" provision to apply only when the government has intervened in the action. The answer turns on the proper definition of "alternate remedy," either as an alternative to judicial enforcement of the FCA once the government has intervened in a *qui tam* suit, or an alternative to intervening in the *qui tam* suit entirely. The facts of this case present an issue of first impression for our circuit. We hold that "alternate remedy" refers to the government's pursuit of any alternative to intervening in a relator's *qui tam* action.

We begin our analysis with the plain language of the FCA. *United States v. Ninety-Three (93) Firearms,* 330 F.3d 414, 420 (6th Cir. 2003) (citations omitted). In so doing, we observe that § 3730(c)(5) does not expressly require the government's intervention before the "alternate remedy" becomes applicable, nor does it define or discuss "alternate remedy" within the context of a government's intervention in a *qui tam* action. Rather, § 3730(c)(5) states that "the Government may elect to pursue its claim through any alternate remedy available to the Government." 31 U.S.C. § 3730(c)(5). The FCA contemplates enforcement by the *qui tam* relator, or intervention and judicial pursuit of the FCA

claims by the government. The most logical reading of "alternate remedy" is as the government's alternative to judicial pursuit of the relator's claims, i.e., an alternative to intervening in a *qui tam* action. The government's interpretation of § 3730(c)(5) as applying only when the government has intervened, on the other hand, is less logical. Section 3730(c)(5) seeks to insure a relator's right to a share of any proceeds obtained through an alternate remedy; yet § 3730(d)(1) already guarantees a relator a percentage of the proceeds if the government intervenes in the action. Thus, limiting "alternate remedy" to situations where the government has intervened would render § 3730(c)(5) at least partially superfluous, a result we generally avoid in construing a statute. *See Ninety-Three (93) Firearms,* 330 F.3d at 420 ("When interpreting the plain language of a statute, we 'mak[e] every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous.'") (quoting *Cafarelli v. Yancy,* 226 F.3d 492, 499 (6th Cir. 2000)) (alteration in *Ninety-Three (93) Firearms*). Thus, we are persuaded that the plain language of § 3730(c)(5) makes clear that a relator's participation rights are preserved when the government pursues the relator's claims through any means alternative to intervening in the *qui tam* action.

The government contends that the FCA's legislative history supports its interpretation of § 3730(c)(5). It points to the Senate Report accompanying the 1986 amendments to the FCA, which states, in pertinent part, the following:

Subsection (c)(3) of section 3730 clarifies that the Government, *once it intervenes* and takes over a false claim suit brought by a private individual, may elect to pursue any alternate remedy for recovery of the false claim which might be available under the administrative process.

S. Rep. 99-345, at 27, 1986 U.S.C.C.A.N. at 5292 (emphasis added). We are not persuaded. In the first place, the quoted passage of the Senate Report refers to § 3730(c)(3), not § 3730(c)(5), suggesting that it might refer to an earlier draft of the 1986 FCA amendments. The quoted passage is particularly difficult to reconcile with the plain language of § 3730(c)(5), which seeks to preserve a relator's rights in the event that the government pursues "any alternate remedy" and makes no mention of intervention as a prerequisite to pursuing the "alternate remedy."

Indeed, another segment of the same Senate Report tends to support our interpretation of "alternate remedy." Specifically, the Senate Report made clear that

> [w]hile the Government will have the opportunity to elect its remedy, it will not have an opportunity for dual recovery on the same claim or claims. In other words, the Government must elect to pursue the false claims action either judicially or administratively and if the Government declines to intervene in a qui tam action, it is estopped from pursing [sic] the same claim administratively, or in a separate judicial action.

*Id.* at 27, 1986 U.S.C.C.A.N. at 5292. Thus, this passage suggests that the government may either proceed judicially (by intervening in the *qui tam* suit) or pursue an alternative to judicial enforcement (i.e., an "alternate remedy").

Moreover, interpreting "alternate remedy" as an alternative to intervening in a *qui tam* action is more consistent with the congressional intent expressed in making the 1986 amendments to the FCA. Congress made it clear that its "overall intent in amending [§ 3730] [was] to encourage more private enforcement suits." *Id.* at 23-24, 1986 U.S.C.C.A.N. at 5288-89. It emphasized its belief that "[i]n the face of sophisticated and widespread fraud . . . only a coordinated effort of both the Government and the citizenry will decrease

this wave of defrauding public funds." *Id.* at 2, 1986 U.S.C.C.A.N. at 5267. It is readily apparent that, under the government's interpretation of § 3730(c)(5), the government could decline to intervene in a *qui tam* suit, then settle that suit's claims separately and deny the relator his or her share of the settlement proceeds simply because the government had not formally intervened in the *qui tam* action. Consequently, the government would frequently carry the incentive to decline to intervene in an action and, having been apprised of possible FCA violations by a private citizen, to independently pursue an investigation of the alleged FCA violator(s). Such a result would not further Congress' legislative intent that the government and private citizens collaborate in battling fraudulent claims, and it would impede, not further, Congress' legislative intent to encourage private citizens to file *qui tam* suits.

Finally, we are not alone in our view of a § 3730(c)(5) "alternate remedy." The Ninth Circuit has held that an administrative suspension or debarment proceeding pursued by the government, and a settlement agreement arising therefrom, constituted an "alternate remedy" within the meaning of § 3730(c)(5), even though the government had not intervened in a *qui tam* suit alleging the conduct contemplated in the settlement. *United States ex rel. Barajas v. United States,* 258 F.3d 1004, 1010-13 (9th Cir. 2001). Similarly, the Fourth Circuit appears to view § 3730(c)(5) as protecting a relator's rights when the government pursues an alternative to intervening in the relator's *qui tam* action. *See LaCorte,* 185 F.3d at 192 ("Section 3730(c)(5) assumes that the original qui tam action did not continue. The government here did not pursue an alternate remedy . . . . It *instead intervened* in the action, prosecuted it, and settled it with the plaintiffs' consent.") (emphasis added).

We therefore hold that a settlement pursued by the government in lieu of intervening in a *qui tam* action asserting

the same FCA claims constitutes an "alternate remedy" for purposes of 31 U.S.C. § 3730(c)(5).

The government argues alternatively that even if the May 8, 2000 settlement agreement operated as an "alternate remedy" for purposes of § 3730(c)(5), Relator nevertheless is not entitled to a relator's share of the settlement proceeds. Its principal contention in support is that the language of the settlement agreement "specifically reserved and excluded" claims asserted in Relator's *qui tam* action from the agreement's "scope and terms." We are not persuaded. If the government has recovered funds lost from conduct asserted in Relator's *qui tam* action, then the government has essentially settled Relator's claims, regardless of whether it formally intervened in Relator's action or not. The FCA provides that a relator is entitled to 15-25% of the proceeds when the government has settled the claims stemming from a relator's valid *qui tam* suit. There is no language in the FCA suggesting that a relator's statutory right to a share of the proceeds from the settlement of claims he or she had asserted may properly be abrogated by an agreement to which the relator was not a party.

Indeed, the government does not provide statutory support for its argument; instead it suggests that the settlement agreement carefully preserved Relator's rights by excluding Relator's claims from the agreement and insuring that Relator could pursue his claims separately. However, this approach would lead to consequences unintended by the FCA. If indeed the government settled Relator's claims, either Defendants would assert an accord and satisfaction defense (which, if successful, would deny Relator part or all of his rightful share of the recovered funds), or Defendants would be forced to pay the civil penalties and double or treble damages associated with the very same claims for which they had already paid penalties and damages by way of the settlement. Under either result, adverse consequences (to either Relator or Defendants) would ensue that the FCA had not intended.

*See* S. Rep. 99-345, at 27, 1986 U.S.C.C.A.N. at 5292 ("While the Government will have the opportunity to elect its remedy, it will not have an opportunity for dual recovery on the same claim or claims."); *id.* at 2, 23-24, 1986 U.S.C.C.A.N. at 5267, 5288-89 (emphasizing its intent to provide a financial incentive for relators bringing valid *qui tam* suits and its belief that the government and private citizens must work together to battle FCA violations).

We therefore hold that the government may not settle a relator's claims and seek to avoid paying a relator his or her statutory share to the settlement proceeds by excluding the relator's claims from the terms of the settlement agreement.[9]

Next, the government asserts that because Relator failed to state a claim with sufficient particularity, as required by Rule 9(b), he would not be entitled to a share of the settlement because his *qui tam* action was invalid. While it is true that a threshold requirement for a relator's ability to share in the proceeds of a FCA lawsuit is to file a valid *qui tam* action, 31 U.S.C.. § 3730(b)(1), we already have decided to remand the case to allow Relator to restate his allegations to comply with Rule 9(b). Therefore, Relator's prior failures in this regard do not offer a present basis for denying his motion.

Finally, the government contends that we alternatively could affirm on grounds that the conduct alleged in Relator's complaint is unrelated to the FCA violations discussed in the

---

[9]Relator also suggests that there is an open factual issue as to the validity of the exclusion language in the settlement agreement because some of the versions circulated to the parties to the settlement did not contain the substituted page 12 with the exclusion pertaining to Relator, and because two of the signatures predated the circulation of the substituted page. Because we hold that the exclusion language in the settlement agreement does not constitute a proper basis for excluding Relator from sharing in the settlement proceeds, we do not reach this issue.

settlement agreement.[10]     According to the settlement agreement, the relevant conduct pertained to Defendants' practice of submitting to Medicare, Medicaid, and TRICARE claims with improper diagnostically related group ("DRG") coding, while Relator's complaint, on the other hand, discussed other types of improper coding. Relator insists that there is overlap between the conduct alleged in his *qui tam* suit and the conduct contemplated in the settlement agreement. He points in support to his original complaint, which alleged that Defendants engaged in "miscoding and upcoding items billed to Medicare and Medicaid" (J.A. at 25), and he also insists that prior to filing his *qui tam* action he had provided the government with information relating to various DRG coding violations. Because the district court held that Relator was not entitled, under any interpretation of 31 U.S.C. § 3730, to a share of the settlement's proceeds, it did not reach this issue and therefore made no findings of fact as to whether there exists any overlap between the conduct in the settlement agreement and the conduct in Relator's *qui tam* action.

Although the government may be correct that the conduct contemplated in the settlement agreement does not overlap with the conduct alleged in Relator's complaint, we decline to decide this factual issue on appellate review. We are aware that we may affirm the district court on any grounds supported by the record. *Hayes v. Equitable Energy Res. Co.,* 266 F.3d 560, 569 (6th Cir. 2001) (citing *United States v. Allen,* 106 F.3d 695, 700 n.4 (6th Cir. 1997)). However, we generally do not consider on appeal an issue not discussed by

the district court, unless "the issue is presented with sufficient clarity and completeness and its resolution will materially advance the progress of . . . litigation." *Pinney Dock & Transp. Co. v. Penn Cent. Corp.,* 838 F.2d 1445, 1461 (6th Cir. 1988) (citations omitted). In the present case, the original complaint's allegation that Defendants engaged in "miscoding and upcoding items billed to Medicare and Medicaid" indicates that there may exist overlap between the settlement agreement's contemplated FCA violations and Relator's allegations. However, this statement in itself is too broad to support a factual finding of overlap. In other words, Relator must provide more concrete evidence that he apprised the government of Defendants' DRG coding violations. We hold that Relator is entitled to an evidentiary hearing at which he may present evidence supporting his assertion that there exists overlap between the information he provided to the government and the FCA violations contemplated by the settlement agreement. The district court will then be able to make findings of fact as to whether there exists any overlap between Relator's allegations and the conduct discussed in the settlement agreement.

Because we hold that Relator might be entitled to a share of the settlement agreement's proceeds, we remand this issue to the district court for further proceedings. Specifically, Relator is entitled to an opportunity to amend his amended complaint in order to state his FCA claims with sufficient particularity. Fed. R. Civ. P. 9(b). If the Relator satisfactorily complies with Rule 9(b)'s particularity requirement, and the district court is satisfied that it has subject matter jurisdiction over the FCA claims, *see, e.g.,* 31 U.S.C. § 3730(e), the district court will then determine whether the conduct contemplated in the May 8, 2000 settlement agreement overlaps with the conduct alleged by Relator in bringing his *qui tam* action. For purposes of making this determination, the district court will hold an evidentiary hearing at which Relator and the government may present evidence in support of their positions.

---

[10]We refer here to Relator's complaint, rather than his amended complaint, because at the time the May 8, 2000 settlement agreement was executed Relator had not yet amended his complaint. Therefore, the original complaint constitutes the operative document for purposes of the inquiry of whether overlap exists between the conduct covered in the settlement agreement and the conduct alleged in Relator's original complaint.

## CONCLUSION

For the foregoing reasons, we **REVERSE** the judgment of the district court, and remand the case to the district court for further proceedings consistent with this opinion.