RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 08a0284p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

LARRY J. WINGET and the LARRY J. WINGET LIVING
TRUST,

　　　　　　　　　　*Plaintiffs-Appellants,*

　　　　*v.*

JP MORGAN CHASE BANK, N.A., JP MORGAN CHASE
& CO., BLACK DIAMOND COMMERCIAL FINANCE,
LLC, and BLACK DIAMOND CAPITAL MANAGEMENT
LIVING TRUST, LLC,

　　　　　　　　　　*Defendants-Appellees.*

No. 07-1657

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 06-13490—Avern Cohn, District Judge.

Argued: March 17, 2008

Decided and Filed: August 11, 2008

Before: RYAN, SILER, and COLE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** John E. Anding, DREW, COOPER & ANDING, Grand Rapids, Michigan, for
Appellants. R. Ryan Stoll, SKADDEN, ARPS, SLATE, MEAGHER & FLOM, Chicago, Illinois,
Melville W. Washburn, SIDLEY AUSTIN, Chicago, Illinois, for Appellees. **ON BRIEF:** John E.
Anding, Thomas V. Hubbard, DREW, COOPER & ANDING, Grand Rapids, Michigan, for
Appellants. R. Ryan Stoll, Andrew J. Jarzyna, Patrick J. Nash, Jr., SKADDEN, ARPS, SLATE,
MEAGHER & FLOM, Chicago, Illinois, Melville W. Washburn, Matthew A. Clemente, Kevin C.
Pecoraro, Brian D. Rubens, SIDLEY AUSTIN, Chicago, Illinois, for Appellees.

_____

## OPINION

_____

　　　SILER, Circuit Judge. Through a series of transactions and agreements between 1999 and
2002, Defendants JP Morgan Chase Bank, N.A., and JP Morgan Chase & Co. (collectively, "JP
Morgan"), served as the agent for a consortium of lenders that advanced credit to Venture Holdings
Company, LLC ("Venture"), which was owned by Plaintiffs Larry J. Winget and the Larry J.
Winget Living Trust (collectively, "Winget"). In 2002, JP Morgan and Winget executed the most
recent and significant amendment to their original credit agreement, and, at the same time, also

executed guarantees and pledges of collateral. These documents allowed JP Morgan significant access to Winget's companies, both Venture and its subsidiaries. As Venture's financial situation deteriorated and the company initiated bankruptcy proceedings, JP Morgan and the other lenders sought increasingly greater control over Winget's companies, eventually resulting in the takeover of one of Venture's subsidiaries. In an alleged attempt to force Winget into a financial settlement, JP Morgan and Defendants Black Diamond Commercial Finance, LLC, and Black Diamond Capital Management Living Trust (collectively, "Black Diamond") (collectively, JP Morgan and Black Diamond are the "Defendants") installed managers at Venture's subsidiaries that acted to significantly devalue the company's assets and initiate additional bankruptcy proceedings. Eventually, the assets of Venture and its subsidiaries were sold pursuant to Section 363 of the Bankruptcy Code. Winget brought its present claims of breach of the guaranty and pledge agreements and requests for declaratory judgments, following a suit by JP Morgan, which sought inspection of the collateral. The district court dismissed Winget's complaint (the "Complaint"), holding that Winget's claims were barred by res judicata, and premature to the extent that they were claims regarding future attempts to repossess collateral. Without seeking leave of the court, Winget filed an amended complaint, which the district court struck. After filing, and losing, a motion for reconsideration, Winget appealed.

Winget now argues that the district court erred in (i) dismissing the Complaint without granting Winget leave to amend; (ii) striking Winget's amended complaint; (iii) failing to apply the correct standard of review when it dismissed the Complaint; (iv) looking to bankruptcy court orders in dismissing the Complaint; (v) not giving Winget the benefit of every inference from the allegations in the Complaint; (vi) ignoring Winget's defensive claims as a guarantor; (vii) holding that Winget's claims were barred by the April 2005 bankruptcy sale order; and (viii) holding that the claims asserted in the Complaint were premature.

We AFFIRM.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. The Winget Companies

Beginning in the 1970s, Winget developed, owned, and controlled a network of companies that supplied plastic parts to automobile manufacturers. The backbone of this network was two companies, their affiliates, and subsidiaries: Venture and Deluxe Pattern Corporation ("Deluxe"). Winget personally owned, either directly or indirectly, one hundred percent of the equity of both Venture and Deluxe. Aside from Venture and Deluxe, Winget also owned P.I.M. Management Co. ("P.I.M."), a Michigan corporation, and Venco #1, LLC ("Venco"), a Michigan limited liability company. In 1995, Winget purchased a foreign company that became Venture Asia Pacific ("Venture AP"), the stock of which P.I.M. held. At the time of this agreement, P.I.M. and Venco had a market value of approximately $250 million.

### II. The Eighth Amendment, Winget Pledge, and Winget Guaranty

On May 27, 1999, a consortium of lenders consisting of JP Morgan, other banks, investment companies, and hedge funds (collectively, the "Lenders") provided credit to Venture pursuant to a credit agreement (the "Credit Agreement"). The parties subsequently amended the Credit Agreement eight times. The most recent, and only pertinent amendment here, was the Eighth Amendment (the "Eighth Amendment"), which was dated October 22, 2002, and executed in connection with a complex "workout" negotiation initiated as a result of the rapid financial deterioration of Venture and significant default under the Credit Agreement.

### a. The Eighth Amendment

Pursuant to this agreement, the Lenders "agreed (1) temporarily not to exercise available rights against Venture and the collateral supporting the loans, and (2) to extend further credit to Venture." In exchange for these terms and the extension of additional credit, Winget agreed to provide additional collateral to support the repayment of Venture's debt, and agreed to additional guaranties. Winget, P.I.M., Venco, and Deluxe all entered into separate guaranty agreements wherein each independently guaranteed certain collateral, which included stock in P.I.M. and Venco, and the collateral was pledged pursuant to pledge agreements. In some cases, these guaranties were enforceable solely through the stock from P.I.M. and Venco, as both companies pledged their respective interests in Venture AP and Venture Holdings. These guaranties were formalized in the Winget Guaranty, the Winget Pledge, and the Consortium Pledge, which were executed concurrently with the Eighth Amendment (collectively, all four documents are the "Guaranty Documents").

### b. The Winget Guaranty, Winget Pledge, and Consortium Pledge

In the Winget Guaranty, executed October 21, 2002, Winget guaranteed Venture's debt, but the document limited Winget's personal exposure, as JP Morgan's only recourse for payment on the Winget Guaranty was foreclosure on certain pledged stock, including P.I.M. and Venco's stock. JP Morgan was required to pursue any foreclosure under the Winget Guaranty pursuant to the terms of the Winget Pledges. The Winget Guaranty limited Winget's personal exposure to approximately $30 million.

The Winget Pledge, also executed October 21, 2002, significantly increased the amount of collateral available to the Lenders by covering Winget's equity interest in nine of its companies, which were under Deluxe's corporate umbrella. That same day, Winget also executed another pledge agreement that covered Winget's interests in P.I.M. and Venco (the "Consortium Pledge").

### c. The Last Resort Conditions

As part of the Guaranty Documents, the Lenders included language that Winget refers to as the "Last Resort Conditions." The relevant portions of the Last Resort Conditions read:

> Notwithstanding anything herein or elsewhere to the contrary, [JP Morgan] shall not exercise any rights or remedies under this Pledge Agreement until all reasonable efforts shall have been made by it to collect the Obligations from other collateral held by [JP Morgan] . . . it being intended that the Collateral provided by this Pledge Agreement shall be realized upon by [JP Morgan] only as a last resort.

> Notwithstanding anything herein or elsewhere to the contrary, no action will be brought for the repayment of the Guaranteed Obligations under this Guaranty and no judgment therefore will be obtained or enforced against Larry Winget other than with respect to the Pledged Stock in accordance with the provisions of the related Pledge Agreements, provided that the Guarantor shall be fully and personally liable for any damages arising from any violations of any of the agreements of the Guarantor herein in favor of the Lenders.

> [N]otwithstanding any other provision in this Pledge Agreement or elsewhere, in the event (i) that [JP Morgan] receives for application on the Obligations an amount of not less than $50,000,000 from the sale or financing of [Venture AP] or [Venture Holdings] operations

or from one or more outsider sources . . . the obligations of the Pledgor hereunder shall be deemed satisfied and the pledge created hereby shall be terminated.

Aside from these three provisions, the Guaranty Documents also allegedly limited Winget's ability to operate Venco, P.I.M., and their subsidiaries through the use of affirmative and negative covenants. The result of the provisions was that the Guaranty Documents were only enforceable from the proceeds of the sale of the interests in the pledged companies, namely Deluxe, P.I.M., Venco, and their subsidiaries (collectively, the "Pledged Companies"), and the Lenders could not attempt to enforce the Guaranty Documents until they had made all reasonable efforts to exhaust the collateral aside from the interests in the Pledged Companies. At any time, Winget could terminate the Guaranty Documents by tendering $50 million to JP Morgan for the benefit of the Lenders.

## III. The Contribution Agreement and Bankruptcy Proceeding

On March 28, 2003, Venture and its subsidiaries filed for Chapter 11 bankruptcy in the Eastern District of Michigan (the "Bankruptcy Proceeding"). In order to allow Venture to exit the Bankruptcy Proceeding, Winget began negotiations with the Lenders, the result of which was an agreement (the "Contribution Agreement"), which was executed on September 23, 2003.

The Contribution Agreement called for a reorganization of Winget's companies, whereby Deluxe, P.I.M., Venco, and their subsidiaries would fall under the umbrella of Venture. Winget agreed to this restructuring in exchange for one hundred percent of the equity in the newly restructured Venture. Under the Contribution Agreement, Winget was not required to agree to exit financing in an amount exceeding $85 million. Winget argued that its amount was critical to maintaining Venture; any amount under $85 million would provide Venture with insufficient liquidity to run the company, and any amount above $85 million would require payments that Venture would be unable to satisfy.

As the Bankruptcy Proceeding commenced, Black Diamond became the debtor-in-possession lender to Venture, financing the company's operation during the Bankruptcy Proceeding. In taking this position, Black Diamond acquired substantial interests from the Lenders, including JP Morgan's interest in its capacity as a lender.

In the months following the commencement of the Bankruptcy Proceeding, the Defendants began to negotiate with Venture and the unsecured creditors, without Winget's participation, to create another plan that would enable exit financing exceeding $85 million. Winget maintained that any such plan would be unenforceable per the terms of the Contribution Agreement, and alleged that with this knowledge, and Winget's expected rejection of a new plan, the Defendants formulated a "scheme" to coerce Winget into participation (the "Scheme").

## IV. The Scheme

Winget alleged that the Defendants created the Scheme to coerce Winget to contribute its interests in the Pledged Companies to the Lenders' collateral pool. Winget claimed that the Scheme was motivated by the Pledged Companies' market value of $250 million, which Winget believed the Defendants hoped to use as part of a foreclosure sale to satisfy Black Diamond and many of the Lenders. Winget alleged that the following were the principal components of the Scheme:

(i)     the Defendants' agreement in April 2004 to provide Venture with financing to fund legal fees for a lawsuit against Winget purporting to seek $300 million;

(ii)    "threats" by Black Diamond to stop making debtor-in-possession loans to Venture unless Deluxe filed a bankruptcy petition;

(iii)     executing proxies to vote the shares of Deluxe as attorney-in-fact for Winget and voting those proxies to replace the directors of those companies with the Defendants' own nominees;

(iv)     immediately upon taking control of Deluxe, removing Winget and others from management, replacing them with "inexperienced management" and committing to enforce the Contribution Agreement; and

(v)     seeking enforcement of the Contribution Agreement for exit financing in an amount in excess of $85 million.

Winget further maintained that during a one-week period in May 2004, the Defendants and their attorneys drafted documents that allowed the Lenders to take over the control of Deluxe. In total, the documents (i) allowed the Lenders to remove the directors of Deluxe, (ii) installed new directors and managers chosen by the Defendants, and (iii) absolved these new directors of any liability resulting from the execution of the Defendants' directives. Winget claimed once in position, these new directors, who lacked experience in the automotive industry, began performing actions that devalued Deluxe to the extent that on May 24, 2004, Deluxe joined Venture in the Bankruptcy Proceeding, which was contemporaneous with the filing of an amendment to the Contribution Agreement. At the time of the filing, the combined value of the Pledged Companies and Venture's assets exceeded the debt Winget owed to the Lenders.

This amendment to the Contribution Agreement allowed for $125 million in exit financing. Winget objected and refused to perform the Contribution Agreement due to this amendment. On January 21, 2005, the bankruptcy court ordered the Contribution Agreement unenforceable against Winget due to the exit financing condition.

## V. The Bankruptcy Court Order

On April 19, 2005, the bankruptcy court ordered the sale of substantially all of Venture and Deluxe's assets pursuant to Section 363 of the Bankruptcy Code (the "Sale Order"). The sale commenced in May 2005, and the proceeds of the sale were applied to Venture's outstanding balance under the Credit Agreement. Following the sale, however, a large amount of Venture's debt remained outstanding under the Credit Agreement.

## VI. Procedural History

### a. *JP Morgan Chase Bank, N.A. v. Winget*

On October 28, 2005, JP Morgan brought suit against Winget to (i) enforce its rights to monitor certain collateral under the Winget Guaranty, and (ii) obtain a declaratory judgment that it had satisfied the Last Resort Conditions. On June 29, 2006, after Winget filed an answer, affirmative defenses, and counterclaims, the district court ordered Winget's counterclaims severed from JP Morgan's suit and litigated in a parallel proceeding. The district court then declined to entertain the declaratory judgment claim, upon which JP Morgan moved for judgment on the pleadings on its claim for specific performance of its rights under the Guaranty Documents to monitor the pledged collateral. Winget appealed this decision and we affirmed the district court's decision. *JP Morgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 579 (6th Cir. 2007) (holding that the Last Resort Conditions did not apply to JP Morgan's inspection rights and that specific performance was the appropriate remedy).

**b. The Present Case**

After the district court severed Winget's counterclaims, Winget filed the Complaint on August 3, 2006. Winget asserted four counts in the Complaint. In Count One, Winget alleged that the Defendants breached the Guaranty Documents and Winget sought a declaration that it was no longer bound by its obligations under the Guaranty Documents. In Count Two, Winget sought a declaratory judgment to redefine and interpret the Last Resort Conditions. In Count Three, Winget sought damages for alleged impairment of collateral, namely impairment of Deluxe's value. In the final count, Count Four, Winget again asserted impairment of collateral, but asked the court to hold that the Lenders be allowed to purchase Winget's interest in Deluxe at its fair market value as of May 21, 2004.

On February 14, 2007, after the Defendants filed motions to dismiss the Complaint, the district court held a hearing on the motions. After further proceedings, the district court dismissed the Complaint, holding that Winget's claims were either barred by res judicata or were future claims that were premature. The district court held that because Winget's claims were based on the Scheme, Winget had an opportunity to litigate those claims before the bankruptcy court entered the Sale Order. Further, the district court held that any claim based on future efforts of the Defendants to collect collateral was premature.

The district court made its ruling on the Defendants' motions on March 7, 2007 (the "Dismissal Order"), and filed its judgment on March 12, 2007. On March 12, 2007, before it received the judgment, Winget filed an amended complaint without leave of the court. The district court struck the amended complaint. On March 21, 2007, Winget filed a motion asking the district court to reconsider the Dismissal Order. On April 12, 2007, the district court denied the motion for reconsideration, noting that the arguments raised by Winget could have been raised in the initial briefing to the court. Even after considering Winget's "new" arguments, the district court determined the arguments did not alter the court's legal conclusions and that Winget's claims were barred by res judicata.

## STANDARDS OF REVIEW

We review de novo a district court's dismissal of a complaint under Fed. R. Civ. P. 12(b)(6). *Greenberg v. Life Ins. Co. of Va.*, 177 F.3d 507, 514 (6th Cir. 1999). We review a district court's decision whether to permit a plaintiff to amend its complaint for abuse of discretion. *United States ex rel Bledsoe v. Cmty. Health Sys.*, 342 F.3d 634, 644 (6th Cir. 2003) (citing *Shepard v. Wellman*, 313 F.3d 963, 971 (6th Cir. 2002)) (holding that we review a district court's decision to dismiss a claim with prejudice for abuse of discretion). However, when the district court bases its denial of a motion to amend on the legal conclusion that the proposed amendment would not survive a motion to dismiss, we review the district court's decision de novo. *Greenberg*, 177 F.3d at 522.

The interpretation of a district court's order is a question of law and, consequently, subject to de novo review. *Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1168 (6th Cir. 1996).

We review de novo a district court's application of res judicata law. *Abbott v. Michigan*, 474 F.3d 324, 331 (6th Cir. 2007) (citing *Bates v. Twp. of Van Buren*, 459 F.3d 731, 734 (6th Cir. 2006)). The party asserting the defense of res judicata bears the burden of proof. *Browning v. Levy*, 283 F.3d 761, 772 (6th Cir. 2002) (citing *Kaiser Aerospace & Elecs. Corp. v. Teledyne Indus. (In re Piper Aircraft Corp., Inc.)*, 244 F.3d 1289, 1295 (6th Cir. 2001)).

## DISCUSSION

**I. The district court acted within its discretion in dismissing the Complaint without leave to amend.**

Because Winget did not request leave to amend the Complaint, the district court's decision not to grant leave to amend the Dismissal Order was within its discretion. The "'district court does not abuse its discretion in failing to grant a party leave to amend where such leave is not sought.'" *Stambaugh v. Corrpro Cos.*, 116 F. App'x 592, 598 (6th Cir. 2004) (unpublished decision) (quoting *Sinay*, 948 F.2d at 1042); *see also Evans v. Pearson Enters, Inc.*, 434 F.3d 839, 853 (6th Cir. 2006) ("The district court did not abuse its discretion by denying [the plaintiff's] first request for leave to amend her complaint because she failed to state the grounds for relief with particularity . . . ."). Requiring the district court to both state the reasons for its dismissal and then allow Winget to amend the Complaint without Winget's having asked permission would be akin to mandating the district court to issue an advisory opinion. "Plaintiffs [are] not entitled to an advisory opinion from the Court informing them of the deficiencies of the complaint and then an opportunity to cure those deficiencies." *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 699 (6th Cir. 2004) (quoting *Begala v. PNV Bank, Ohio, N.A.*, 214 F.3d 776, 784 (6th Cir. 2000)) (emphasis in *Begala* omitted).

Winget argues that the district court was required to give him the opportunity to amend the Complaint and quotes *United States ex rel Bledsoe*, 342 F.3d at 644, for this proposition: "[W]here a more carefully drafted complaint might state a claim, a plaintiff must be given at least one chance to amend the complaint before the district court dismisses the complaint with prejudice." (quoting *EEOC v. Ohio Edison Co.*, 7 F.3d 541, 546 (6th Cir. 1993)). While Winget correctly quotes *United States ex rel Bledsoe*, it also states that, "Denial may be appropriate, however, where there is '. . . futility of the amendment . . . .'" (quoting *Morse v. McWhorter*, 290 F.3d 795, 800 (6th Cir. 2002)); *see Kottmyer v. Maas*, 436 F.3d 684, 692 (6th Cir. 2006) ("A district court may deny a plaintiff leave to amend his or her complaint . . . when the proposed amendment would be futile."). Futility is certainly the case here; Winget's claims were not dismissed for lack of specificity, failure to allege an element of a claim, or other deficiencies. Rather, Winget's claims were dismissed because they were either barred by res judicata or were premature. Regardless of the merits of these claims, or the various ways in which Winget might phrase them in subsequent complaints, Winget cannot pursue them.

Winget attempts to circumnavigate the res judicata and prematurity bars by arguing that it could have pled three additional matters that would have cured any defect in the Complaint. These matters are: (i) "the context of the Sale Order and the intent of the parties who drafted that Order," (ii) allegations "that a later order by [the bankruptcy court] could be interpreted as demonstrating that the Sale Order was not intended to, and did not, preclude the claims in the Complaint," and (iii) "pleading of the current impact of harm to Winget, Venco, and P.I.M. from compliance with the negative covenants included in the Guaranty Documents." However, none of these matters would lift the res judicata bar for Winget.

With respect to the first two matters, Winget argues that because of their potential impact on the interpretation of the Sale Order, they save Winget from res judicata. However, the cases that Winget cites for this proposition are contract cases that involve the interpretation of ambiguous and conflicting contractual language. *See Greenburg*, 177 F.3d at 516 (discussing "internal inconsistencies in the policy language"); *Terry Barr Sales Agency, Inc. v. All-Lock Co.*, 96 F.3d 174, 178-79 (6th Cir. 1996) (concerning a dispute about an oral contract); *Klapp v. United Ins. Group. Agency, Inc.*, 663 N.W. 2d 447, 452-53 (Mich. 2003) (addressing terms that "irreconcilably conflict"). Furthermore, the district court held that the terms of the Sale Order were clear, and

matters concerning the interpretation of court orders, such as sale orders, are questions of law. *Brady*, 101 F.3d at 1168.[1]

As for the third matter, these claims would not be new to an amended complaint; Winget raised them at the hearing on the motion to dismiss. Further, even taking Winget's claims as true–that it is experiencing present harm from restrictions imposed in the negative covenants–does not render these claims ripe for litigation. Any allegations of past wrongdoing are barred by res judicata, and present harm does not become justiciable until the Defendants attempt to collect the collateral.

Because any amended complaint would have been futile, the district court did not abuse its discretion in not granting Winget leave to amend the Complaint.

## II. The district court correctly struck Winget's amended complaint.

Winget argues that the district court erred in striking Winget's amended complaint, which Winget filed after the dismissal of the Complaint, without first seeking and obtaining leave of the court. Winget points to Fed. R. Civ. P. 15(a) for the proposition that it had a right to file an amended complaint without leave of court because, as of the Dismissal Order, the Defendants had not yet answered the Complaint. Winget also argues that the Dismissal Order was not a final order dismissing the Complaint; rather, Winget contends that the final order was not entered until the March 12, 2007 judgment. Winget also quotes our language in *Network Communications v. Michigan Bell Co.*, 906 F.2d 237, 238 (6th Cir. 1990), that an "order dismissing a complaint is not a final order when it is possible for a plaintiff to file an amended complaint resurrecting the lawsuit."

However, Winget's citation here, as above, is misguided. In *Network Communications*, we held that while the plaintiff's original complaint was dismissed by summary judgment, the district court expressed specific intent to adjudicate a pending motion to amend the complaint. Such an expression by a district court would make it possible for a plaintiff to resurrect an otherwise expired lawsuit. There was no such expression on the part of the district court here; rather, the district court made it clear that Winget's claims cannot be brought, as they were either barred by res judicata or were premature, and an amended complaint could not remedy these problems.

Winget does indeed correctly interpret Rule 15(a) to allow a plaintiff to file an amended complaint without leave of court when the defendant has not filed a responsive pleading. A motion to dismiss is not considered a responsive pleading under Rule 15(a). *See Ohio Cas. Ins. Co. v. Farmers Bank of Clay*, 178 F.2d 570, 573 (6th Cir. 1949). Therefore, to the extent that the Defendants had not responded to the Complaint, Winget was free to file an amended complaint without leave of court. However, Winget's dilemma is not that the Defendants answered the Complaint, but that the district court entered a final judgment prior to Winget's filing its amended complaint.

We have interpreted Rule 15(a) to require a party to seek leave of court to amend its complaint once the district court has entered a final judgment. *Belle v. FBI*, 46 F. App'x 326, 347 (6th Cir. 2002) ("After judgment has been entered, a complaint may not be amended without leave of court.") (unpublished decision). Winget argues that the Dismissal Order was not a final order, and that the final order was entered on March 12, 2007, with the entry of the Judgment. As Winget

---

[1] In reviewing a complaint in conjunction with a motion to dismiss, a district court is not required to accept a plaintiff's legal conclusions as true. *Murphy v. Sofamor Danek Group, Inc. (In re Sofamor Danek Group, Inc.)*, 123 F.3d 394, 400 (6th Cir. 1997). In order for this claim to survive a motion to dismiss if it were included in an amended complaint, the district court would have to accept Winget's legal conclusions as true. As it was under no obligation to do so, allowing Winget to file an amended complaint that hinged on the acceptance of a legal conclusion would be futile.

did not file its amended complaint until the morning of March 12, 2007, before the entry of the judgment, the distinction is critical to its argument. Unfortunately, however, Winget draws a distinction without a difference. With the Dismissal Order the district court clearly intended to dispose of the Complaint and Winget's case in their entirety. Even though the district court waited until March 12, 2007, to enter judgment in this case, the intention and effect of the Dismissal Order were a final judgment. As such, Winget was required to seek leave of court before filing an amended complaint. Because Winget did not do so, the district court did not err in dismissing Winget's amended complaint.

## III. The district court employed the correct standard of review in examining the Complaint.

In reviewing a district court's dismissal of a case pursuant to Fed. R. Civ. P. 12(b), we, like the district court, take all well-pled allegations as true. *Greenberg*, 177 F.3d at 515. However, we, like the district court, "need not accept as true legal conclusions or unwarranted factual inferences." *Murphy v. Sofamor Danek Group, Inc. (In re Sofamor Danek Group, Inc.)*, 123 F.3d 394, 400 (6th Cir. 1997). "[W]e conduct essentially the same analysis as the district court in that 'we take the plaintiff's factual allegations as true and if it appears beyond doubt that the plaintiff can prove no set of facts in support of its claims that would entitle it to relief, then . . . dismissal is proper.'" *Greenberg*, 177 F.3d at 515 (quoting *Wiener v. Klais & Co.*, 108 F.3d 86, 88 (6th Cir. 1997)). The district court cannot grant a motion to dismiss based on its disbelief of the plaintiff's factual allegations. *Murphy*, 123 F.3d at 400. "[W]hen an allegation is capable of more than one inference, it must be construed in the plaintiff's favor." *Sinay v. Lamson & Sessions Co.*, 948 F.2d 1037, 1039-40 (6th Cir. 1991).

After reviewing both the Complaint and the Dismissal Order, it is clear that the district court applied the correct standard of review, accepting as true Winget's allegations. The district court conducted a thorough analysis of Winget's claims and determined that even taking the allegations as true, the claims were either barred by res judicata or were premature. Such determinations did not rest on a disbelief of Winget's factual allegations or failure to accept them as true; rather, the determinations were the only possible legal conclusions the court could reach after accepting Winget's facts as pled. For instance, even accepting as true that the Defendants did engage in a scheme to devalue Deluxe and force Winget to accept the Defendants' terms, any litigation resulting from the scheme was barred by res judicata. Further, accepting as true Winget's allegation that the Defendant's actions devalued collateral, such claims are premature until the Defendants attempt to collect on that collateral. Under any analysis the Complaint could not have survived the motions to dismiss.

Winget argues that the district court erred in not drawing *all* inferences in its favor. Specifically, Winget contends that the district court should have construed the Sale Order so as not to bar Winget's claims, namely that the district court should have determined that the Sale Order was not a final order. Winget conducts a lengthy examination of the Sale Order to support its argument, but to no avail. To hold that the Sale Order was not a final order would require a legal conclusion on the district court's part. Winget asks us to hold that the district court was required to accept Winget's legal conclusions as true, and we, like the district court, are not required to do so and do not err in a refusal. *See Murphy*, 123 F.3d at 400. Further, any interpretation of the language of the Sale Order is also a question of law, thereby necessarily requiring a legal conclusion on the part of the district court. *See Brady*, 101 F.3d at 1168. Because Winget was not entitled to have *all* of its allegations accepted as true, the district court did not err in refusing to accept as true Winget's legal conclusions.

Furthermore, it is clear that there is no set of facts that Winget could prove that would entitle it to relief. *See Greenberg*, 177 F.3d at 515. Regardless of what facts Winget might have pled and

the district court accepted as true, Winget's claims were continuously barred by res judicata or premature for the reasons stated below.

## IV. The district court acted without error in looking to the bankruptcy court orders when dismissing the Complaint.

When reviewing a motion to dismiss, a district court may not consider matters beyond the complaint. *Kostrzewa v. City of Troy*, 247 F.3d 633, 643 (6th Cir. 2001) (citing 2 James Wm. Moore et al., Moore's Federal Practice § 12.34[2] (3d ed. 2000)). If the district court considers evidence outside the complaint, it effectively converts the motion to dismiss to a motion for summary judgment. *Id.* (citing Fed. R. Civ. P. 12(b)(6)); *see also Carter v. Stanton*, 405 U.S. 669, 671 (1972). The district court must then give the parties a "'reasonable opportunity to present all material made pertinent to such a motion by Rule 56.'" *Id.* (citing Fed. R. Civ. P. 12(b)(6)). Other circuits have held, however, that the district court may look to certain documents outside the complaint and such action does not result in a conversion of the motion to dismiss to a motion for summary judgment. The Third Circuit, in *Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group Ltd.*, 181 F.3d 410, 426 (3d Cir. 1999), wrote, "To resolve a 12(b)(6) motion, a court may properly look at public records, including judicial proceedings, in addition to the allegations in the complaint." (citing numerous Third Circuit opinions for this proposition). "Specifically, on a motion to dismiss, we may take judicial notice of another court's opinion not for the truth of the facts recited therein, but for the existence of the opinion, which is not subject to reasonable dispute over its authenticity." *Id.*

Here, Winget argues that the district court improperly took judicial notice of facts in the bankruptcy court documents in dismissing the Complaint. Examining the Dismissal Order, it appears that the court looked to two bankruptcy court documents: the Sale Order and Winget's own objections to the Sale Order, which were eventually resolved. Although the district court quotes a paragraph from Winget's objection to the Sale Order, the district court did so not in a way that took judicial notice of the facts in the paragraph, but rather in a way that took notice that Winget made an objection to the Sale Order based largely on the same claims in the Complaint, and then later withdrew that objection. The district court also points to the Sale Order only to say that it was a final order for res judicata purposes. In neither case did the district court act improperly or accord the bankruptcy court documents undue weight. Accordingly, the district court did not err in looking to the bankruptcy court documents when examining the Complaint.

## V. The district court did not err in ignoring the independence of Winget's claims as a guarantor.

Winget asserts that even if the district court correctly interpreted the bankruptcy documents and applied the proper rules of construction under Fed. R. Civ. P. 12(b) in interpreting the Complaint, it erred by precluding Winget's claims as an independent guarantor. Winget cites *Wallace Hardware Co. v. Abrams*, 223 F.3d 382, 402 (6th Cir. 2000), to support its argument that "this Circuit has recognized that the doctrine of *res judicata* (claim preclusion) does not preclude a guarantor's independent, defensive claims even if they arise out of the same facts and claims that the principal debtor and the creditor (here Defendants) resolved in a prior bankruptcy proceeding." Winget's reliance on *Wallace Hardware* for this proposition is misplaced, as it incorrectly cites the holding in that case.

Unlike the present case, *Wallace Hardware* involved a guaranty agreement that permitted "a creditor to compromise a claim against the principal debtor without discharging the guarantor's liability." *Id.* (noting that the courts will generally enforce such an agreement). The question before us in *Wallace Hardware* was whether the guarantor could assert breach-of-contract defenses ordinarily reserved for the principal in an action brought by the creditor when the principal was

insolvent. *Id.* After noting that a discharge in bankruptcy does not ordinarily affect a guarantor's liability, we allowed the guarantor to set off the principal's defenses against the creditor due to the principal's insolvency. *Id.* The facts and issues of *Wallace Hardware* did not deal with res judicata and whether a final sale order in bankruptcy serves to bar any claims that a party to that proceeding could have brought at the time of sale. *Id.*

Alternatively, in direct contrast to Winget's argument, we have held that "[r]es judicata bars not only the parties to an earlier bankruptcy proceeding from later bringing suits which should have been brought in the context of the proceeding, but also those in privity with the parties." *Browning*, 283 F.3d at 772 (citing *Sanders Confectionary Pros., Inc. v. Heller Fin., Inc.* 973 F.2d 474, 481 (6th Cir. 1992)). "Privity in this sense means a successor in interest to the party . . . ." *Id.* Winget's sole opportunity to bring its claims was prior to the bankruptcy court's entry of the Sale Order. Winget cannot now bypass the res judicata bar and its failure to bring timely suit by arguing that its claims are independent as a guarantor and permissible without citing to any authority for such an assertion. Consequently, the district court correctly ignored the alleged independence of Winget's claims as a guarantor.

## VI. The district court correctly held that Winget's claims were barred by res judicata.

The district court held that "[o]verall, Winget's claims are barred by res judicata." In doing so, the court noted that Winget's allegations of the Defendants' wrongdoing could have been raised in the bankruptcy court, "whether [the allegations] took place prior to the bankruptcy filings or during the bankruptcy proceedings." The district court correctly outlined the elements of res judicata. We have held that,

> [A] claim is barred by the res judicata effect of prior litigation if all of the following elements are present: "(1) a final decision on the merits by a court of competent jurisdiction; (2) a subsequent action between the same parties or their 'privies'; (3) an issue in the subsequent action which was litigated or which should have been litigated in the prior action; and (4) an identity of the causes of action."

*Browning*, 283 F.3d at 771-72 (quoting *Bittinger v. Tecumseh Prods. Co.*, 123 F.3d 877, 880 (6th Cir. 1997)).

Regarding the first element, we have never explicitly held that a bankruptcy court's final sale order is a final decision on the merits for res judicata purposes. *See Wells v. TCF Nat'l Bank (In re Hi Tech Fleet Serv., Inc.)*, 339 B.R. 428, 432 (Bankr. E.D. Mich. 2006) (noting that the issue of whether a bankruptcy court's sale order is a final order "appears to be [an issue] of first impression in the Sixth Circuit"); *see also Vickers v. IRS (In re Scott James Fortier)*, 161 F. App'x 514, 517 (6th Cir. 2005) (unpublished decision) (holding that in that case the bankruptcy court's sale order was a final order for res judicata purposes). Other circuits have held that bankruptcy courts' sale orders are final orders for res judicata purposes. *See Bank of Lafayette v. Baudoin (In re Baudoin)*, 981 F.2d 736, 742 (5th Cir. 1993) ("Our precedent clearly establishes that bankruptcy court orders authorizing the sale of part of the estate or confirming such sale are final judgments on the merits for *res judicata* purposes." (italics in original)); *Met-L-Wood Corp. v. Gekas (In re Met-L-Wood Corp.)*, 861 F.2d 1012, 1016 (7th Cir. 1988) (holding that bankruptcy court's order confirming judicial sale or a debtor's estate was a final, appealable order); *In re Sax*, 796 F.2d 994, 996 (7th Cir. 1986) (holding that orders approving the sale of debtor's property are final decisions).

We have also held that finality "is considered in a more pragmatic and less technical way in bankruptcy cases than in other situations." *Lindsey v. O'Brien, Tanksi, Tanzer & Young Health*

*Care Providers of Conn. (In re Dow Corning)*, 86 F.3d 482, 488 (6th Cir. 1996) (quoting *In re Cottrell*, 876 F.2d 540, 541-42 (6th Cir. 1989)). "Therefore, where an order in a bankruptcy case 'finally dispose[s] of discrete disputes within the larger case,' it may be appealed immediately." *Id.* (quoting *In re Saco Local Dev. Corp.*, 711 F.2d 441, 444 (1st Cir. 1983)); *see also Morton v. Morton (In re Morton)*, 298 B.R. 301, 303 (6th Cir. B.A.P. 2003) (noting that a bankruptcy court's order overruling a Chapter 13 debtor's objection to claims was a final order because it ended litigation on the merits and left nothing for the court but the execution of judgment). Finally, we have also held that "[a]s a general rule, the '[c]onfirmation of a plan of reorganization constitutes a final judgment in bankruptcy proceedings.'" *Browning*, 283 F.3d at 772 (quoting *Sanders Confectionary*, 973 F.2d at 480). "Such confirmation by a bankruptcy court 'has the effect of a judgment by the district court and res judicata principles bar relitigation of any issues raised or that could have been raised in the confirmation proceedings.'" *Id.* (quoting *Still v. Rossville Bank (In re Chattanooga Wholesale Antiques, Inc.)*, 930 F.2d 458, 463 (6th Cir. 1991)).

We join other circuits in holding that a bankruptcy court's sale order is a final order for res judicata purposes, not only because it is in line with our holdings that an order confirming a reorganization is a final order, but also because it is in line with the policy behind res judicata. As the United States Supreme Court wrote in *Federated Department Stores, Inc. v. Moitie*, 452 U.S. 394, 401 (1981):

> This Court has long recognized that "[p]ublic policy dictates that there be an end of litigation; that those who have contested an issue shall be bound by the result of the contest, and that matters once tried shall be considered forever settled as between the parties." We have stressed that "[the] doctrine of *res judicata* is not a mere matter of practice or procedure inherited from a more technical time than ours. It is a rule of fundamental and substantial justice, 'of public policy and private peace,' which should be cordially regarded and enforced by the courts . . . ."

(internal citations omitted). A sale order signals an end to litigation in a bankruptcy proceeding; with the execution of the sale order the debtor's assets are judicially sold and no further litigation can be brought regarding those assets without forcing the court to undo the sale, an action of the very kind res judicata seeks to prohibit. If sale orders were not final, parties could continue to litigate issues regarding the assets long after their sale, which is certainly an outcome worth prohibiting. As such, we hold that a sale order is a final order for res judicata purposes.

Because a bankruptcy court's sale order is a final order for res judicata purposes, the first element of res judicata is met here. *See Browning*, 283 F.3d at 771-72 (quoting *Bittinger v. Tecumseh Prods. Co.*, 123 F.3d 877, 880 (6th Cir. 1997)). On March 19, 2005, the bankruptcy court issued the Sale Order, which authorized the sale of substantially all of the assets of both Venture and Deluxe. This Sale Order was a final order.

Winget asserts that we should not construe the Sale Order as a final order because its claims "do not attack the necessary and appropriate findings of the Sale Order." However, Winget fallaciously argues that its claims determine the characterization of the Sale Order; they do not. Rather, the Sale Order is independently characterized as final depending on whether it is intended to dispose of litigation. *See In re Dow Corning*, 86 F.3d at 488. Here, the bankruptcy court's intention was to dispose of the case, and the district court correctly interpreted the Sale Order as a final order for res judicata purposes.

The second element of res judicata is also met here, as there is subsequent action between the same parties or those in privity with the parties to the original action. In the present case, the

original action was the Bankruptcy Proceeding. Among the original parties to that proceeding, as identified in the Sale Order, were Venture, Deluxe, Winget, and the Lenders. Winget does not contest that the parties here were parties to the Bankruptcy Proceedings.

The third element of res judicata is satisfied because Winget could have, and indeed should have, brought its action during the Bankruptcy Proceeding. As the district court correctly noted, claims are considered related to a bankruptcy proceeding if "the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." *Browning*, 283 F.3d at 773 (quoting *Sanders Confectionary*, 973 F.2d at 482.) "Stated another way, a claim is 'related to' the bankruptcy proceeding if it would have affected the debtor's rights or liabilities." *Id.* (citing *In re Dow Corning Corp.*, 86 F.3d at 489). As Winget's claims attack the Defendants' pre-bankruptcy actions and allege that the Defendants deliberately devalued the assets of Deluxe prior to its bankruptcy proceeding and subsequent sale, those claims would have had a direct effect on the assets in the bankruptcy proceeding. For example, in the Complaint Winget asks for a declaratory judgment that would require the court to value Deluxe's assets at their pre-bankruptcy value. As those assets have largely been sold, a request for such an order could only have been brought prior to the sale of those assets.

Although Winget argued before the district court that it was unaware of all of the facts needed to bring the claims before the bankruptcy court at the time of that proceeding, such argument is belied by the fact that the claims Winget brings in the Complaint are largely identical to the arguments Winget made in its objection to the Sale Order, which it later withdrew. For instance, in its objection Winget argued:

> Mr. Winget believes he has meritorious claims against the Senior Lenders who . . . have engaged in a course of unlawful conduct resulting in damages to the Debtor's business, in essence, a precipitous decline in the value of the Venture Debtors' and Deluxe Debtors' businesses and assets and a corresponding devaluation of Mr. Winget's interests.

Further, all of the actions that Winget alleged in the Complaint took place before the bankruptcy proceeding. In fact, not a single factual allegation in the Complaint occurred after May 25, 2004.

Winget also asks us to read the third element of res judicata broadly, arguing that the element does not require parties to bring any claim that could be litigated at the earlier proceeding at that time. Winget cites to language from a Delaware bankruptcy case to support its argument, noting that the fact that a "party may have an interest in a motion does not require that party to raise all interests or claims that it has in the bankruptcy case generally at the time the motion is heard . . . . To apply res judicata so broadly would bring bankruptcy cases to a halt." *Phillip Servs. Corp. v. Luntz (In re Phillip Servs. Corp.)*, 267 B.R. 62, 68 (Bankr. D. Del. 2001). Indeed, on this point Winget is correct; res judicata makes no such requirement. Rather, it bars a party from bringing any claim that *should* have been litigated in the earlier proceeding. "[W]hat is important is not whether a particular claim is compulsory, but whether the claim should have been considered during the prior action." *Sanders Confectionary Prods.*, 973 F.2d at 484. But Winget's claims were not akin to those that might be generally raised in a motion before a bankruptcy court. Instead, Winget's claims attacked the heart of the Sale Order: the value of the assets. Those claims should only have been brought before the bankruptcy court issued the Sale Order.

The final element of res judicata requires that there be an "identity of claims," which is satisfied if "'the claims arose out of the same transaction or series of transactions," or if "the claims arose out of the same core of operative facts.'" *Browning*, 283 F.3d at 773-74 (quoting *Micro-Time Mgmt. Sys., Inc. v Allard & Fish, P.C. (In re Micro-Time Mgmt. Sys., Inc.)*, 983 F.2d 1067 (6th Cir.

1993)). Winget urges us to take a narrow approach to this element and hold that its claims did not arise out of the same series of transactions or operative facts as the Bankruptcy Proceeding because the Sale Order did not mention the Guaranty Documents, and because the Sale Order did not reference the same time period as the allegations in the Complaint. Specifically, Winget asks us to adopt tests that are used in the Third and Eleventh Circuits, which narrowly define "identity" when res judicata is used in conjunction with bankruptcy proceedings. *See Eastern Minerals & Chem. Co. v. Mahan*, 225 F.3d 330, 337-38 (3d Cir. 2000) (holding that "a claim should not be barred unless the factual underpinnings, theory of the case, and relief sought against the parties to the proceeding are so close to a claim actually litigated in the bankruptcy that it would be unreasonable not to have them brought at the same time in the bankruptcy forum"); *Eastman Kodak Co. v. Atlanta Retail, Inc. (In re Atlanta Retail, Inc.)*, 456 F.3d 1277, 1280 (11th Cir. 2006) (holding that an identity of claims only exists if "the resolution of [the second] claim explicitly [was] part of the bankruptcy plan"). Adoption of such tests would not, however, be in line with current res judicata jurisprudence in this circuit, which has adopted the traditional view of identity as a res judicata element.

We are not required, as Winget requests, to parse the Sale Order to determine whether the final element of res judicata is met. Looking at the Complaint, it is clear that the factual allegations contained therein pertain not just to the Sale Order, but to the larger transactions and facts of Winget and the Defendants' continuous dealings. These were the same transactions and facts on which Winget based its objection to the Sale Order. The transactions and facts that form the basis for Winget's allegations are the same transactions and facts that led to the Bankruptcy Proceeding. As such, Winget's argument fails and the fourth, and final, element of res judicata is met here.

In sum, the district court did not err in holding that Winget's claims were barred by res judicata.

## VII. The district court correctly held that Winget's claims were not reserved in the Sale Order, and thus should have been brought during the Bankruptcy Proceeding.

In addition to its arguments as described above regarding the finality of the Sale Order, Winget alternatively argues that its claims are not barred by res judicata because it preserved its claims in the Sale Order. Specifically, Winget maintains that Paragraph 39 of the Sale Order preserved its claims. Paragraph 39 reads:

> Nothing in the Sale Order . . . shall limit or impair any claim . . . that Mr. Larry J. Winget or any entity owned or controlled by Larry J. Winget (other than the Debtors) . . . have or may have against [JP Morgan] or [Black Diamond] . . . relating to their acts, conduct, omissions or relationship, contractual or otherwise, as to the Winget Entities . . . .

The district court correctly held that this language was unambiguous, and reserved claims against the Defendants for their actions in relation to Winget's companies that were not parties to the Bankruptcy Proceeding. The language of Paragraph 39 specifically said that claims relating to "the Debtors," which were Venture and Deluxe, were not reserved.

Language reserving claims must be precise and identify the claims sought to be retained. *Browning*, 283 F.3d at 774-75. Here, the language meets that requirement and clearly reserves only those claims which pertain to Winget's other companies. Winget urges us to engage in an elaborate reading of Paragraph 39; we decline to do so. Winget's argument that it successfully reserved its present claims is contrary to the language of Paragraph 39, and to grant Winget a broad, rather than honed, reading of the paragraph would be contrary to our jurisprudence.

**VIII. The district court correctly held that Winget's claims related to any future repossession of collateral were premature.**

The district court correctly held that to the extent that Winget's claims challenge the Defendants' compliance with the Last Resort Conditions, such claims are premature. These claims are premature because the Defendants have not yet enforced the Guaranty Documents; when they do so, Winget may then bring a claim that the Defendants' actions violated the Last Resort Conditions. Any attempt to bring the claim before the Defendants attempt to possess the collateral is premature. "'[A] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Cooley v. Granholm*, 291 F.3d 880, 883-84 (6th Cir. 2002) (quoting *Texas v. United States*, 523 U.S. 296 (1998)). As a rule, we do not allow litigation on premature claims to ensure that courts litigate "only existing, substantial controversies, not hypothetical questions or possibilities." *City Commc'ns, Inc. v. City of Detroit*, 888 F.2d 1081, 1089 (6th Cir. 1989). Because Winget's claims regard the valuation of collateral the Defendants have not yet sought, those claims are only hypothetical questions or possibilities, and the district court correctly dismissed those claims.

**AFFIRMED.**