# United States Court of Appeals
### For the Eighth Circuit

_____

No. 11-2054
_____

Neal Roberts, United States of America, ex rel; Norman Rille, United States of
America, ex rel

*Plaintiffs - Appellees*

United States of America

*Intervenor Plaintiff - Appellant*

v.

Accenture, LLP, An Illinois limited liability partnership; Accenture, Ltd., a
Bermuda Corporation; Avanade, Inc., a Delaware Corporation; Microsoft
Corporation, a Washington Corporation

*Defendant*s

Hewlett-Packard Company

*Intervenor Defendant*
_____

Appeal from United States District Court
for the Eastern District of Arkansas - Little Rock
_____

Submitted: January 12, 2012
Filed: March 1, 2013
_____

Before BYE, SMITH, and COLLOTON, Circuit Judges.

_____

BYE, Circuit Judge.

Relators Norman Rille and Neal Roberts brought a *qui tam* action against Hewlett-Packard Company (HP) alleging HP engaged in unlawful kickback and defective pricing schemes in its sale of computer equipment to the federal government. The United States intervened in the action and reached a $55 million settlement with HP, allocating $9 million of the settlement to the kickback scheme and $46 million to the defective pricing scheme. The district court[1] awarded the relators a 21% share of the kickback settlement and a 15% share of the defective pricing settlement pursuant to 31 U.S.C. § 3730(d)(1). The United States appeals, contending the relators are not entitled to any share of the $46 million allocated to the defective pricing scheme. We affirm.

I

Systems integration consultants (SICs) recommend computer systems and related technology products to the federal government. SICs sometimes buy computer products directly from manufacturers and then resell them to the government; other times SICs recommended a particular manufacturer to the government and the manufacturer sells its products directly to the government.

Accenture LLP and Accenture Ltd. (collectively Accenture) were SICs. Norman Rille worked as a senior manager for Accenture from 2000 to 2002. While working at Accenture, Rille discovered the company was involved in what it called an "Alliance" relationship with HP and other computer and technology vendors who

_____

[1]The Honorable Billy Roy Wilson, United States District Judge for the Eastern District of Arkansas.

sold computer equipment to the government. Under these "Alliance" relationships, SICs received kickbacks from HP and other companies in two forms: (1) lump sum payments made by HP to SICs for recommending HP products to the government; and (2) discounts given to SICs when they purchased HP products for resale to the government.

Rille left Accenture with over 700,000 pages of electronic data related to the "Alliance" relationships. He shared this information with Neal Roberts, a certified fraud examiner. Roberts investigated the relationships by studying the data provided by Rille. On September 8, 2004, Roberts and Rille disclosed the documents involving the Alliance relationships to the government.

Shortly thereafter on September 17, 2004, Rille and Roberts filed a *qui tam* action against HP and other defendants on behalf of the United States. The original complaint alleged HP violated the Anti-Kickback Act, 41 U.S.C. §§ 51-52, as well as the False Claims Act (FCA), 31 U.S.C. §§ 3729-3733. The relators alleged the computer companies defrauded the government out of "hundreds of millions of dollars" by exchanging unlawful kickbacks to consultants for government referrals and by engaging in defective pricing schemes.

As relevant to the issues now on appeal, the relators amended their complaint to set forth the fraud allegations in more detail. The amended allegations regarding the defective pricing scheme stated HP "exploited the trust the Government ha[d] reposed in them . . . to provide accurate best pricing information."[2] Second Am.

_____

[2]HP's contracts with the federal government required HP to disclose its "best prices," that is, the lowest prices HP offered to "end users" for its products. End users are buyers who purchase a product for their own use rather than for resale. The federal government used best pricing information to set its own contract prices with HP.

Compl. at ¶ 5, App. at 47. More specifically, the Second Amended Complaint alleged:

> [A]s part of the schemes to defraud the Government and concealment, Defendants failed to provide to GSA and other governmental agencies current, accurate, and complete disclosure of their best pricing (after all discounts, rebates, and other benefits) for any entities, whether such entity sells to the Government or not, . . . thereby causing defective GSA and other governmental pricing schedules. This resulted in FCA violations, as to both direct sales to the Government by a Defendant, and indirect sales through [a consultant], Alliance, or Technology Vendor, with or without a Kickback.

Id. at ¶ 6, App. at 48.

During the course of the relators' suit, the relators worked closely with government investigators and attorneys to corroborate HP's unlawful practices. Among other things, the relators hosted meetings with government officials in September 2005 and August 2006 to coordinate prosecution of the fraud action. In October 2005, the government asked the relators' counsel to draft administrative subpoenas to issue from the General Services Administration (GSA) Office of Inspector General (OIG) to all potential defendants, including HP, and compiled voluminous binders for the government's use, detailing thirty-one separate subpoenas. Also at the government's request, in November 2006 the relators prepared a "lexicon" of forms used by HP in Alliance programs. The relators also purchased a document review software system called "Ringtail" to electronically house the voluminous documents produced as a result of the subpoenas, along with thirty-eight individual licenses for federal agents to use the Ringtail system to review the documents. Federal agents made use of the licenses. For example, over a three-year period beginning in September 2006, one OIG agent accessed roughly 4,230 documents using the Ringtail system.

After responding to the subpoenas, HP notified the government it had hired an independent third party to assess its business processes to determine whether it had engaged in defective pricing schemes. In August 2008, HP notified the government of the results of the independent audit, admitting it had not complied with the price reductions clause in one particular government contract, GS-35F-0066N (hereinafter Contract 35F). The government then performed its own audit of Contract 35F and determined HP had not fully informed the GSA of prices it had given to non-government end users, resulting in a "defectively priced" GSA contract. Ultimately, HP changed its practices by lowering its prices by 10%, saving the government millions of dollars.

The government decided to intervene directly in the relators' action in December 2006 and filed its own complaint against HP and the other defendants in the relators' action in April 2007. In its separate complaint, the government acknowledged the relators' complaint "made detailed allegations regarding the Relators' direct and independent knowledge of [the] wrongdoing alleged herein." Government Compl. at ¶ 9. In many respects, the government's complaint simply paraphrased directly from the relators' complaint.

On August 30, 2010, the government and HP entered into a settlement agreement of what they labeled the conduct "covered" by the relators' action. Under the terms of the settlement, the government received $55 million from HP. The government attributed $9 million of the settlement to the kickback scheme alleged in the relators' action, and attributed the remaining $46 million to the defective pricing scheme related to Contract 35F. In the settlement agreement, the government attributed the defective pricing settlement to HP's "voluntary" disclosure of its false pricing and the government's subsequent audit. The relators' action was dismissed with prejudice as a result of the settlement.

After the district court approved settlement, the relators moved for a determination of their share of the settlement proceeds pursuant to 31 U.S.C. § 3730(d)(1).[3] The relators contended the government had no knowledge of HP's misconduct prior to the relators' complaint, and the relators had devoted substantial effort and assistance to investigating HP's fraud, including drafting the subpoenas that caused HP to hire an independent third party to conduct an audit of its pricing practices. The relators argued they were entitled to a percentage of both the kickback and defective pricing portions of the settlement award.

In response, the government conceded the relators were entitled to a share of the $9 million settlement involving the kickback scheme. The government argued, however, the relators were not entitled to any portion of the $46 million defective pricing settlement. The government claimed the relators' allegations of defective pricing failed to satisfy the requirements for pleading fraud under Rule 9(b) of the Federal Rules of Civil Procedure. In addition, the government contended the discovery of defective Contract 35F resulted from HP's voluntary disclosure and the government's own investigation, and was wholly unrelated to the relators' action.

The district court was unpersuaded by both of the government's contentions. The district court held the government's Rule 9(b) argument was untimely. The district court also found the defective pricing claim settled by the government was

---

[3]The FCA provides in relevant part:

> If the Government proceeds with an action brought by a [private] person . . . such person shall . . . receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim, depending upon the extent to which the person substantially contributed to the prosecution of the action.

31 U.S.C. § 3730(d)(1).

related to the action brought by the relators. The district court found a relationship between HP's internal investigation and the relators' complaint and assistance in prosecuting the action, noting "HP began its internal investigation just a few weeks after the seal was partially lifted [on the relators' complaint and] a copy of Relators' Complaint [was] provided to HP." The district court also found "[t]he government had no knowledge of the defective pricing before Relators brought it to light." As a result, the district court held the relators were entitled to the minimum 15% finder's fee with respect to the $46 million attributed to the defective pricing settlement. The district court also determined the relators were entitled to 21% of the $9 million kickback settlement.

The government filed a timely appeal. On appeal, the government does not contest the 21% awarded to the relators on the $9 million kickback settlement, but renews its contentions that the relators are not entitled to any portion of the $46 million defective pricing settlement.

II

We review the district court's factual findings for clear error and its legal conclusions de novo. Clay v. Bd. of Educ. of City of St. Louis, 90 F.3d 1357, 1361 (8th Cir. 1996). Before reviewing the government's challenges to the district court's fact findings and legal conclusions, we begin with a brief summary of the overall structure of the FCA with respect to a relator's right to share in a recovery.

The government has three options when a relator initiates a *qui tam* action on behalf of the government under the FCA. The government's ultimate election among the options has a direct effect on the relator's right to share in a recovery. First, the government may elect not to intervene in the relator's action. In such situations, the relator is left to pursue the action on her own on behalf of the government, while the government sits on the sidelines and is merely served with copies of all pleadings and

deposition transcripts filed in the action. 31 U.S.C. § 3730(c)(3). If a relator successfully prosecutes the action on her own, she is entitled to a greater percentage of any amount ultimately recovered – 25% to 30% of the "proceeds of the action or settlement" as well as "reasonable expenses . . . plus reasonable attorneys' fees and costs." Id. § 3730(d)(2). Because the government elected to intervene in this action, this provision is not in play.

Second, the government may elect to intervene in the relator's action. The FCA provides that a relator is entitled to a share of a settlement from a *qui tam* action when "the Government proceeds with an action brought by a [relator]." 31 U.S.C. § 3730(d)(1). In cases where the government elects to intervene, the relator is entitled to a lesser share of any amount ultimately recovered – 15% to 25% of the "proceeds of the action or settlement of the claim" depending upon the extent to which the person substantially contributed to the prosecution of the action. Id. § 3730(d)(1). This is what occurred here. The action was originally brought by the relators, and the government subsequently intervened.

In cases such as this where the government intervenes, the minimum share of 15% is viewed as a finder's fee to which a relator is entitled even when he or she does not substantially contribute to the prosecution of the action. See S. Rep. 99-345, 1986 U.S.C.C.A.N. at 5293 (describing the 15% minimum as a "definite amount" which could "be looked upon as a 'finder's fee' which the person bringing the case should receive as of right").

> If the Government comes into the case, the person is guaranteed a minimum of 15% of the total recovery even if that person does nothing more than file the action in federal court. This is in the nature of a "finder's fee" and is provided to develop incentives for people to bring the information forward. The person need do no more than this to secure an entitlement to a minimum 15%.

132 Cong. Rec. H9382-03.

-8-

There are three statutory exceptions to the 15% minimum finder's fee in situations where the government elects to proceed with a relator's action and obtains a judgment or settlement. The statutory exceptions to the minimum finder's fee are as follows: (1) an additional reduction if the relator himself "planned and initiated" the FCA violation, see 31 U.S.C. § 3730(d)(3); (2) no share in a recovery if the relator "is convicted of criminal conduct arising from his or her role in the violation," id.; or (3) a limitation of the relator's share to "no . . . more than 10 percent of the proceeds" when the relator's claim is "based primarily on disclosures of specific information" traceable to a source other than the relator, id. § 3730(d)(1). Thus, in cases where the government elects to intervene in an action, a relator is entitled to a share of the recovery between 15% and 25% unless one of the three statutory exceptions permitting an additional reduction applies.

Finally, the government "may elect to pursue its claim through any alternate remedy available to the Government, including any administrative proceeding to determine a civil money penalty." Id. § 3730(c)(5). When the government elects to pursue an alternate remedy, the relator who initiated the original action "shall have the same rights in such proceeding as such person would have had if the action had continued under this section." Id. The government did not elect to pursue an alternate remedy in this case, and thus this provision is not in play.

In this case, the government's election to proceed with the action originally brought by Rille and Roberts triggered the 15% to 25% provisions of the FCA. In addition, the district court found that Rille and Roberts substantially contributed to the prosecution of the action. Finally, none of the three statutory exceptions permitting an additional reduction were applicable because (1) neither relator planned or initiated the FCA violation, (2) neither relator was prosecuted criminally for a role in the FCA violation, and (3) the relators' action was not based primarily upon disclosures of information attributable to a source other than the relators. Indeed, the district court specifically found "the Government had no knowledge of the defective

pricing before Relators brought it to light," and the government does not challenge that fact finding on appeal. As a result, the district court correctly awarded the relators a share of the defective pricing settlement.

The government argues the relators are not entitled to a share of the defective pricing settlement, despite the government's election to proceed with the relators' action, on the grounds that the defective pricing claim it settled was not the same defective pricing claim alleged in the relators' complaint. The government argues if it pursues a factually unrelated claim not contained in a relator's complaint, the FCA does not entitle the relator to any share in the corresponding recovery. This argument fails on both the facts and the law with respect to the circumstances present in this case.

With respect to the facts involved in this case, the district court found the defective pricing claim settled by the government was related to the action brought by the relators. The government has failed to identify on appeal any clear error in that factual finding, and we find none. As the district court noted, HP began the internal audit of its pricing practices only after becoming aware of the allegations in the relators' complaint, and only after responding to the extensive subpoenas drafted by the relators at the government's request. Thus, the government's claim that HP's disclosure of its defective pricing on Contract 35F was purely "voluntary," and that the relators' pending action and assistance in prosecuting the action played no role in uncovering the defective pricing scheme, is disingenuous.

With respect to the law applicable to this case, the government argues the defective pricing scheme alleged in the relators' complaint should not be considered the same defective pricing claim the government settled with HP involving Contract 35F unless the relators' complaint satisfied the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure. The government argues a *qui tam* claim which is deficient as measured by Rule 9(b) standards "necessarily lacks the

type of specific information about fraud that would provide the government any meaningful assistance." The government therefore urges our court to incorporate the requirements for surviving a motion to dismiss under Rule 9(b) into the test for determining whether "the Government proceeds with an action brought by [a relator]" for purposes of an award to a *qui tam* plaintiff under 31 U.S.C. § 3730(d). The government contends if a particular *claim* is not pleaded with enough sufficiency to survive a motion to dismiss, it should not be considered part of the *action* in which the government elects to intervene.

We reject the contention that Rule 9(b) plays a part in determining whether a relator is entitled to share in the settlement proceeds resulting from a *qui tam* action in which the government elects to intervene. Rule 9(b)'s standards are meant to test the sufficiency of a complaint at its outset. If a defendant challenges the sufficiency of a complaint's allegations at the outset of a case, a plaintiff still has the opportunity to cure the deficiency. In contrast, section 3730(d) only comes into play at the conclusion of a case, after the action has already proceeded to a judgment or a settlement. If the government is allowed to contend at the conclusion of a case that a relator's initial allegations were insufficient, even though the government implicitly acknowledged the legal sufficiency of the pleadings by choosing to intervene, the relator no longer has the opportunity to cure the deficiency. We finding nothing in the FCA's statutory text to support this type of *post hoc* use of Rule 9(b) to deny a relator the right to a share of the settlement proceeds in an action in which the government intervenes.

Our conclusion is consistent with an analogous situation addressed by the D.C. Circuit in United States ex rel. Batiste v. SLM Corp., 659 F.3d 1204, 1210 (D.C. Cir. 2011). Batiste involved a *qui tam* action alleging SLM Corporation (commonly called Sallie Mae) was defrauding the government through its administration of certain student loans by granting forbearances in violation of federal forbearance regulations. 659 F.3d at 1206. Before Batiste filed his *qui tam* action, another

putative relator, Michael Zahara, had already filed a *qui tam* action making similar allegations of fraud against Sallie Mae. Zahara's action was still pending when Batiste filed his complaint, but Zahara's complaint was ultimately dismissed without prejudice when he was unable to obtain counsel to represent him. Id. at 1207.

After Batiste filed his *qui tam* action containing fraud allegations similar to those involved in Zahara's action, the government moved to dismiss Batiste's complaint under the FCA's first-to-file rule, which provides "[w]hen a person brings an action under [the qui tam] subsection, no person other than the Government may intervene or bring a related action based on the facts underlying the pending action." 31 U.S.C. § 3730(b)(5). Batiste opposed the government's motion to dismiss, arguing Zahara's earlier-filed suit was not a pending action under the first-to-file rule because his complaint did not meet Rule 9(b)'s heightened pleading standards for fraud allegations. The district court rejected Batiste's argument, found that his complaint contained the same material elements of fraud as Zahara's complaint, and granted the government's motion to dismiss. Batiste, 659 F.3d at 1207-08.

On appeal, the D.C. Circuit affirmed the district court. In explaining its holding, the court included a discussion of the different purposes served by the FCA and Rule 9(b)'s heightened pleading requirements:

> Rule 9(b) is designed to protect defendants in fraud cases from frivolous accusations and allow them to prepare an appropriate response. Section 3730(b) is designed to allow recovery when a *qui tam* relator puts the government on notice of potential fraud being worked against the government, but to bar copycat actions that provide no additional material information. As the district court found, a complaint may provide the government sufficient information to launch an investigation of a fraudulent scheme even if the complaint does not meet the particularity standards of Rule 9(b).

Id. at 1210.

-12-

This analysis applies with equal force when determining whether a relator is entitled to a share of the proceeds under section 3730(d). A primary purpose of the FCA is to encourage whistleblowers to come forward with allegations of fraud perpetrated upon the government, see id., and to reward them when they do so. This purpose is advanced when a relator files a complaint which "provides the government sufficient information to pursue an investigation" into the allegedly fraudulent practices. Id. The FCA's purpose was advanced in this case. The relators' complaint and assistance in prosecuting the action resulted in HP investigating its pricing practices. The government then chose to intervene in the relators' action, initiated its own investigation into HP's defective pricing, and ultimately reached a settlement favorable to the government. Thus, the relators' action served its intended purpose, and the relators should be rewarded accordingly.

Two additional cases cited by the government merit our discussion. First, the government relies upon United States ex rel. Bledsoe v. Community Health Systems, Inc., 501 F.3d 493 (6th Cir. 2007) (Bledsoe II). Sean Bledsoe brought a *qui tam* action in February 1998 alleging the Community Health Systems (CHS) in White County, Tennessee, were engaging in various fraudulent acts that increased reimbursements they received from the government through Medicare and Medicaid. 501 F.3d at 497-98. Significantly, prior to Bledsoe filing his action, the Office of the Inspector General of the Department of Health and Human Services had already approached CHS about possible irregularities in its Medicare billing practices in the fall of 1997. Id. at 499. As a result of the government's inquiry, CHS agreed to perform an audit; the government also began an investigation through the Department of Justice to determine whether FCA violations occurred as a result of the irregular billing practices. Id. Although Bledsoe, a respiratory staff therapist at CHS, had met with a government agent after filing his *qui tam* action to share his suspicions about the irregular billing practices (first meeting in June 1998), he was unaware of the government's separate and already ongoing investigation. Id.

As a result of the government's own investigation, the government and CHS reached a settlement agreement in March 2000 which required CHS to pay the government $30,494,000 in exchange for a release from any civil or administrative monetary claim arising from the irregular billing practices between October 1994 and December 1997. This settlement specifically excluded any claims Bledsoe was bringing in his *qui tam* action. Id.

In July 2000, after the settlement, Bledsoe filed an amended complaint in his *qui tam* action, trying to connect his lawsuit to the settlement and claim a share of it. The district court denied Bledsoe's request because the government had elected not to intervene in the *qui tam* action and instead pursued its own settlement negotiations. The district court also concluded Bledsoe's complaint did not plead the fraud claims settled by the government with sufficient particularity. Id. at 499-500.

Bledsoe appealed and won. The Sixth Circuit said the relevant issue was not the fact that the government pursued settlement without intervening, because the settlement could constitute an alternate remedy under § 3730(c)(5), in which case Bledsoe could still be entitled to a share of the proceeds. United States ex rel. Bledsoe v. Cmty. Health Sys., Inc., 342 F.3d 634, 647 (6th Cir. 2003) (Bledsoe I). The Sixth Circuit also said the district court abused its discretion by dismissing Bledsoe's amended complaint for non-compliance with Rule 9(b)'s fraud specificity requirements, because the issue of whether a plaintiff must comply with Rule 9(b) to plead an FCA violation was unsettled at the time. Id. at 645. The court remanded the case to the district court, indicating it could not determine whether the allegations in the *qui tam* action sufficiently overlapped with the claims settled by the government, holding that on remand Bledsoe must provide "concrete evidence that he apprised the government of Defendants' DRG coding violations" before he could share in the settlement proceeds. Id. at 651.

-14-

On remand, Bledsoe filed a second amended complaint and again made a claim for a share of the settlement proceeds. After an evidentiary hearing, the district court again denied the request, concluding Bledsoe failed to show his disclosures to the government led in any way to the settlement agreement entered into between the government and CHS. The district court also dismissed Bledsoe's second amended complaint. Bledsoe filed a second appeal challenging the dismissal of his complaint and the district court's denial of his request to share in the settlement proceeds.

In Bledsoe II (the case the government now relies upon) the Sixth Circuit held Bledsoe's complaint had to comply with Rule 9(b)'s fraud particularity requirements to survive a motion to dismiss, and Bledsoe's complaint did not satisfy Rule 9(b)'s requirements because it "lack[ed] specific dates or claims submitted to Medicare or Medicaid." Bledsoe II, 501 F.3d at 515. The Sixth Circuit also concluded Bledsoe could not share in the settlement proceeds "because he has not alleged a valid *qui tam* action that overlaps in any way with the conduct covered by the Settlement Agreement." Id. at 522.

Bledsoe II does not guide our analysis here. Unlike here, where the government elected to intervene in the relators' action, Bledsoe II was a case where the government chose to pursue an alternate administrative remedy. The government had already started its own investigation prior to Bledsoe filing his initial *qui tam* action, and prior to Bledsoe meeting with government officials. After the fact, Bledsoe tried to amend his complaint twice to allege a sufficient connection between his action and the government's existing settlement, and still failed to allege or prove such a connection, or to show he provided any information to the government that led to the settlement.

Here, there was no existing government investigation prior to the relators' action, the government chose to intervene in the relators' action, there is a temporal connection between the subpoenas issued by the relators and HP's internal audit, and

-15-

the settlement itself was reached in the relators' action. In addition, in <u>Bledsoe II</u> the relator failed to show that any information he disclosed to the government led to the settlement. In sharp contrast, the information Rille and Roberts disclosed to the government was related to the settlement. Indeed, the district court specifically found "the Government had no knowledge of the defective pricing before Relators brought it to light," and the government does not challenge that factual finding on appeal.

The second case the government relies upon is <u>Rockwell International Corp. v. United States</u>, 549 U.S. 457 (2007). <u>Rockwell</u> addressed whether a relator, James Stone, qualified as an "original source" for jurisdictional purposes under the FCA. The statute considered by the Supreme Court required a relator to have "direct and independent knowledge of the information on which the allegations [in a *qui tam* action] are based" before a court could exercise jurisdiction over a *qui tam* action which itself was based upon publicly disclosed allegations.[4] 31 U.S.C. § 3730(e)(4)(A) (1994). The Supreme Court ultimately determined the relator did not qualify as an "original source" of the only claim which succeeded at trial – a claim alleging pondcrete blocks stored at a nuclear weapons plant were leaking hazardous and nuclear waste due to a faulty mixture of cement and sludge. The Supreme Court held this successful claim was unrelated to a claim alleged by the relator predicting the plant would produce insolid pondcrete blocks because of a defective piping system. The Supreme Court focused on the fact that the relator was no longer employed at the plant when it changed the ratio of cement to sludge which caused the leaking to occur:

> Stone's prediction that the pondcrete would be insolid because of a flaw
> in the piping system does not qualify as "direct and independent

---

[4]Publicly disclosed allegations included those based upon public disclosures "from the news media," 31 U.S.C. § 3730(e)(4)(A) (1994), and in <u>Rockwell</u> it "was conceded that the claims on which [the relator] prevailed were based upon publicly disclosed allegations within the meaning of § 3730(e)(4)(A)." <u>Rockwell</u>, 549 U.S. at 467.

knowledge" of the pondcrete defect. Of course a qui tam relator's misunderstanding of why a concealed defect occurred would normally be immaterial as long as he knew the defect actually existed. But here Stone did not know that the pondcrete failed; he predicted it. Even if a prediction can qualify as direct and independent knowledge in some cases (a point we need not address), it assuredly does not do so when its premise of cause and effect is wrong. Stone's prediction was a failed prediction, disproved by Stone's own allegations. As Stone acknowledged, Rockwell was able to produce "concrete hard" pondcrete using the machinery Stone said was defective. According to [the government's] allegations in the final pretrial order, the insolidity problem was caused by a new foreman's reduction of the cement-to-sludge ratio in the winter of 1986, long after Stone had left Rocky Flats.

Rockwell, 549 U.S. at 475-76.

Rockwell does nothing to advance the government's arguments here. The action brought by Rille and Roberts was not based upon publicly disclosed allegations within the meaning of the FCA, and the court's jurisdiction over this action was never challenged on the grounds that the relators did not qualify as "original sources." The government has never alleged the relators did not have direct and independent knowledge of the defective pricing, but instead focused on an after-the-fact alleged inadequacy in the pleadings alleging the claim. Here, as the district court specifically found, HP's disclosure regarding Contract 35F resulted from HP's knowledge of the relators' defective pricing allegations, and from the relators' assistance in prosecuting the action. The government has not shown this finding of fact to be clearly erroneous.

In sum, this case turns on fact findings the district court made regarding the relationship between the relators' action (as well as the relators' assistance in prosecuting the action) and HP's subsequent disclosure of defective pricing in Contract 35F. The government has failed to reveal any clear error in the district

-17-

court's factual findings regarding that relationship. Moreover, at least with respect to those *qui tam* actions in which the government elects to intervene, a relators' initial allegations need not satisfy Rule 9(b)'s heightened pleading requirements in order to accomplish the purpose they were meant to serve, which is to "provide the government sufficient information to launch an investigation of a fraudulent scheme[.]" Batiste, 659 F.3d at 1210.

Unlike the dissent, we do not believe the district court's findings of fact were insufficient to justify awarding the relators a share of the recovery. When the district court held the government's Rule 9(b) argument was untimely, it specifically rejected the government's contention that the defective pricing claim covered in the settlement was not "part of this law suit." R. Doc. 125, at 3. The district court also stated the fact that the defective pricing claim alleged in the Second Amended Complaint was "further developed after the Government intervened is not a reason to deprive Relators of their share of the settlement." Id. at 4. Most significantly, the district court specifically found the "Government successfully proceeded with claims initially brought by Relators, and Relators are entitled to a share of the proceeds." Id. at 5. These comments make it clear the district court found the defective pricing alleged by the relators was the same defective pricing claim the government settled.

III

For the reasons stated, we affirm the judgment of the district court.

COLLOTON, Circuit Judge, dissenting.

The court's characterization of this case as one that "turns on fact findings" of the district court, *ante*, at 17, obscures a significant legal issue that is central to the appeal: When the government proceeds with an action brought by a relator under the False Claims Act, and then settles both the claim brought by the relator and a

different claim that was not brought by the relator, is the relator entitled to a share of the proceeds of both claims? The better view according to the text and structure of the statute is that the relator may recover only from the proceeds of the settlement of the claim that he brought.

The False Claims Act, 31 U.S.C. §§ 3729-3733, provides that a private person "may bring a civil action for a violation of section 3729 for the person and for the United States Government." *Id.* § 3730(b)(1). Section 3729 establishes liability for certain acts that constitute false claims against the government. When a private person brings an action under § 3730(b), the government has the option to "proceed with the action" or to "decline[] to take over the action." *Id.* § 3730(b)(4). If the government "proceeds with an action brought by a person under [§ 3730](b)," then such person shall, with an exception not relevant here, receive a percentage of "the proceeds of the action or settlement of the claim." *Id.* § 3730(d)(1).

This case requires the court to decide what constitutes "the proceeds of the action or settlement of the claim." Neal Roberts and Norman Rille are private *qui tam* relators who brought an action against Hewlett-Packard Company ("HP") under § 3730(b). The government elected to proceed with the action, and it eventually reached a settlement with HP. As the court explains, *ante*, at 5, the settlement agreement attributed $9 million to a kickback scheme that was alleged in the action brought by Roberts and Rille, and $46 million to a defective pricing scheme related to contract number GS-35F-0066N ("Contract 35F") of the General Services Administration. HP disclosed the defective pricing scheme after the government took over the action and HP conducted an independent audit of its business processes. The question presented is whether the proceeds of the settlement concerning the defective pricing scheme are "proceeds of the action or settlement of the claim," such that the relators are entitled to receive a percentage.

-19-

Roberts and Rille contend that if the government proceeds with an action brought by a relator, then the relator is automatically entitled to a percentage of any "proceeds" that the government receives as a result. The text of the statute will not bear this construction. The relators are entitled to a share of "the proceeds of the action or settlement of the claim." 31 U.S.C. § 3730(d)(1). The Act contemplates that both an "action" and a "claim" are filed in court. *See id*. § 3730(e)(4)(A). In distinguishing between "the action" and "settlement of the claim," § 3730(d)(1) reads as though Congress meant for the first clause ("proceeds of the action") to capture proceeds of an action litigated to judgment and for the second clause ("proceeds of the . . . settlement of the claim") to encompass proceeds of a settlement. *See also* 31 U.S.C. § 3730(d)(2) ("If the Government does not proceed with an action under this section, the person *bringing the action or settling the claim* shall receive an amount . . . .") (emphasis added). With respect to settlement, § 3730(d)(1) is clear that the relator's share is based only on proceeds of "the claim." The use of the definite article refers back to a claim that is "brought by" the relator in "an action" that he initiates. The settlement language does not extend to a different claim that is settled by the government but not originally "brought by" the relator. This case involves a settlement. The relators' right to recovery is thus limited to a share of the settlement of the claim that they brought.

The relators focus on the phrase "proceeds of the action," and assert that "once the government intervenes in the relators' case and receives proceeds," the relator is entitled to a share of all the proceeds. Appellee's Br. at 28. Even assuming the proceeds-of-the-action clause applies in the case of a settlement, the phrase "proceeds of the action" refers back to "an action brought by a person." The relators would have this mean proceeds not of the action *as brought by the relators*, but proceeds of the action as developed after intervention by the government. As a textual matter, this seems unnatural. The phrase "proceeds of the action" is paired with "proceeds of the . . . settlement of the claim," and the settlement clause plainly refers to "the claim" brought by the relator, not a claim later added by the government. It would

be odd to read the adjoining clause—"proceeds of the action"—to encompass more than the action as brought by the relator. It also would be inconsistent with the purposes of the Act to permit a relator automatically to receive a share of the proceeds when the relator might have had nothing to do with the government's recovery on a particular claim that was added after the government's intervention.

The relators' reading also would conflict with the Sixth Circuit's approach to an interrelated provision of the Act. Section 3730(c)(5) provides that if the government pursues "its claim through any alternate remedy available to the Government," then "the person initiating the action shall have the same rights" in the alternate proceeding "as such person would have had" if the government had proceeded with the original action. This means that "the relator has a right to recover a share of the proceeds of the alternate remedy to the same degree that he or she would have been entitled to a share of the proceeds of an FCA action." *United States ex rel. Barajas v. United States*, 258 F.3d 1004, 1010 (9th Cir. 2001) (internal quotation omitted). A relator, however, is not entitled to a share of *whatever* recovery the government obtains from the defendant in an alternate proceeding, just because the government's claim could have been added to the original action brought by the relator. As the Sixth Circuit explained in *United States ex rel. Bledsoe v. Community Health Systems, Inc.*, 342 F.3d 634 (6th Cir. 2003), a relator seeking recovery must establish that "there exists [an] overlap between Relator's allegations and the conduct discussed in the settlement agreement." *Id*. at 651. A relator is not entitled to a share of the proceeds derived from a non-overlapping claim that the government could have added in the original action but instead pursues in an alternate proceeding. Given the equivalence of recovery required by § 3730(c)(5) and § 3730(d), it follows from *Bledsoe* that the relator also has no right to a share if the government adds the non-overlapping claim to the original action after intervening.

So the question in this case is whether the government's recovery from HP for the defective pricing claim is the "proceeds of the . . . settlement of the claim," that

is, "the claim" brought by the relators. The Sixth Circuit understandably construed "the claim" to extend to proceeds of a settlement in which "the conduct contemplated in the settlement agreement . . . overlap[s] with the conduct alleged in [the] Relator's complaint." *Bledsoe*, 342 F.3d at 651. Otherwise, the government could deprive the relator of his right to recover simply by recasting the same or similar factual allegations in a new claim or by pursuing the substance of the relator's claim in an alternate proceeding.

But in its March 2011 order determining the relators' share of settlement proceeds, the district court apparently adopted a different theory of recovery—namely, that the claim brought by the relators *caused* HP to disclose additional information that led the government to achieve the settlement of a *different* claim. As the district court put it, "HP would not have initiated [its] investigation had Relators not filed this law suit," and "[i]t is no coincidence that HP began its internal investigation just a few weeks after the seal was partially lifted so that a copy of Relators' Complaint could be provided to HP." R. Doc. 143, at 7. The court affirms the award to the relators on this basis, concluding that HP's disclosure of its defective pricing was not purely voluntary, and that the causal connection described by the district court was sufficient to show that "the defective pricing claim settled by the government was related to the action brought by the relators." *Ante*, at 10.

Whatever the merit of this theory as a policy matter, it is not derived from the statute. The statute allows relators to recover a percentage of the proceeds of the settlement of "the claim" brought by the relators, and only that claim. The Act contemplates that the government, after it elects to intervene, may "clarify or add detail" to the claims brought by the relators, or may "add any additional claims." 31 U.S.C. § 3731(c). Recovery under § 3730(d)(1), however, does not extend to proceeds of the settlement of such "additional claims," whether or not they are causally connected to the claim brought by the relators. The Act does not provide for an award to relators from the proceeds of settlements that "resulted from" the claim

-22-

or were "caused by" the claim; relators are limited to a percentage of "proceeds of the . . . settlement of *the claim*."

To resolve this dispute, therefore, we need additional findings of fact. The district court should make findings about whether there is sufficient factual overlap between the defective pricing claim settled by the government and the claim brought by the relators, such that proceeds of the settlement of the defective pricing claim should fairly be characterized as "proceeds of the . . . settlement of the claim" brought by the relators. In its January 2011 order denying the government's motion for determination of relators' status, the district court did find that "defective pricing was a part of the allegations made by Relators," R. Doc. 125, at 5, but this brief statement is insufficient to sustain the award. The court did not explain whether and how any "defective pricing" alleged by the relators is the same as the defective pricing that gave rise to the government's settlement with HP. Without elaboration by the district court about any asserted factual overlap, there is not a sufficient record to allow for meaningful appellate review. *See* Fed. R. Civ. P. 52(a); *King v. United States*, 553 F.3d 1156, 1161-62 (8th Cir. 2009); *Darst-Webbe Tenant Ass'n Bd. v. St. Louis Hous. Auth.*, 339 F.3d 702, 711-12 (8th Cir. 2003).

Responding to this dissent, in its penultimate paragraph, the court says the district court found that "the defective pricing alleged by the relators was the same defective pricing claim the government settled." *Ante*, at 18. The court thinks it most significant that the district court said "the Government successfully proceeded with claims initially brought by Relators, and Relators are entitled to a share of the proceeds." *Id.* There are several difficulties with this afterthought.

First, the passages cited by the court do not establish the necessary finding. The district court did not say that the relators alleged in their complaint that HP engaged in defective pricing with respect to Contract 35F. The district court said in its January 2011 order that the relators raised "defective pricing claims."

-23-

R. Doc. 125, at 5. But an allegation that HP engaged in defective pricing in one discrete area of its large corporate enterprise (*e.g.*, in failing to disclose discounts the company offered to resellers) does not present a "claim" with respect to any and all defective pricing that might later be discovered in other areas of HP's business (*e.g.*, failing to disclose the lowest prices the company offered to end users). In its March 2011 order, the district court appeared to acknowledge that the government's settlement of the defective pricing claim with respect to Contract 35F was based on information disclosed by HP after the government's intervention, and that the relators were not a part of the ensuing investigation. R. Doc. 143, at 7. The court found, however, that "HP would not have initiated this investigation had Relators not filed this law suit." *Id*. In other words, the court found in the March 2011 order that the relators' claims were a catalyst that resulted in the disclosure of new information that led to part of the government's settlement, but the court did not find that the relators actually brought a claim alleging defective pricing with respect to Contract 35F.

Second, even if the January 2011 order could be construed as a finding that the relators brought a claim concerning defective pricing under Contract 35F, the order does not afford this court "a clear understanding of the basis of the trial court's decision," as required by Rule 52(a). *See Allied Van Lines, Inc. v. Small Bus. Admin.*, 667 F.2d 751, 753 (8th Cir. 1982) (internal quotation omitted). The January 2011 order does not explain how the court concluded that the relators' second amended complaint raised a claim concerning defective pricing under Contract 35F. The March 2011 order suggests, if anything, that the court thought the defective pricing claim that the government settled was an additional claim added after the government's intervention, *see* 31 U.S.C. § 3731(c), albeit as a result of an internal HP inquiry that was prompted by the relators' lawsuit.

Third, although the court asserts in the end that the district court found that the relators brought the same claim that the government settled, the court never reviews whether such a finding is supported by the record. The court affirms the district

court's award based on a different theory—that is, that the relators' action played a role in uncovering the defective pricing scheme that was the subject of the government's settlement. *Ante*, at 10. But as discussed, the court's theory is legally flawed, because the statute does not give relators the right to a share of recovery based on additional claims that the government brings or settles after it intervenes in an action to pursue a claim or claims brought by relators.

For these reasons, I would vacate the judgment and remand for further proceedings.

_____